STATE OF NEBRASKA, APPELLEE, V. JOHN O. CAVE, APPELLANT.

484 N.W.2d 458

Filed May 29, 1992.    No. S-90-1153.

Thomas M. Kenney, Douglas County Public Defender, and Kelly S. Breen for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

This is a criminal case in which the defendant-appellant, John O. Cave, was charged with first degree murder for the killing of Rose Kimball (count I), attempted first degree murder for the shooting of Linda Meck (count III), and two counts of using a firearm in the commission of a felony (counts II and IV). See Neb. Rev. Stat. §§ 28-303, 28-201, and 28-1205 (Reissue 1989). The defendant pled not guilty and also, though the record does not so reflect, apparently waived his right to a jury trial, resulting in the case being tried to the Douglas County District Court sitting without a jury. The court found the defendant guilty of both counts of use of a firearm in the commission of a felony and, regarding counts I and III, guilty of the lesser-included offenses of second degree murder and attempted second degree murder. See Neb. Rev. Stat. § 28-304 (Reissue 1989).

The court sentenced the defendant to life imprisonment on count I, 15 to 30 years' imprisonment on count III, and 6 to 15 years' imprisonment on each of counts II and IV. The court ordered that the sentences imposed on counts II and IV run consecutively to those imposed on counts I and III and that the sentence imposed on count III run concurrently with those imposed on counts I and II. Finally, the court granted the defendant credit for 163 days' time served and ordered him to pay the costs of the action. From the foregoing judgment and sentences, the defendant appeals.

## FACTUAL BACKGROUND

During November and December 1989, the defendant lived with Linda Meck, Marvin Morton, and Linda's 10-year-old son, Lance, at their residence in Omaha, Nebraska. Linda subsequently married Marvin, and at the time of trial, she was known as Linda Morton. Linda had offered the defendant a place to stay after he broke up with his girl friend. Linda testified that during this time period, the defendant was depressed over the breakup and was drinking heavily.

On December 29, Linda spent the day with her best friend, Rose Kimball. At approximately 5 p.m., Linda, Rose, Lance, and Rose's 2-year-old daughter, Marie, stopped by Linda's residence. They found the defendant sitting in the living room drinking wine. Linda testified that the defendant was "pretty out of it," meaning he was very intoxicated. When Linda told Marvin that they were going over to Rose's, the defendant decided to go along.

Linda, Rose, the two children, and the defendant left in Rose's car. They stopped at a liquor store, where Linda bought the defendant some wine, and then at a fast-food restaurant, where they purchased some food, before going to Rose's house. As they ate their dinner at Rose's, the defendant twice asked Rose if he could stay at the house. When Rose responded in the negative, the defendant became upset and angry. Linda testified that the defendant told them that "if he couldn't have — have both of us, he didn't want nobody to have us." Linda also testified that after the breakup with his girl friend, the defendant wished to pursue a romantic relationship with Rose, but Rose was not interested.

At approximately 6 p.m., Rose went upstairs to take a nap, telling Linda to wake her in time for their 7 o'clock Alcoholics Anonymous meeting. The defendant also went upstairs to take a nap at this time. A short time later, Linda sent Lance to wake Rose. After telling his mother that he had awakened Rose, Lance went back upstairs to play with an Atari computer game located in one of the bedrooms. Lance testified that while he was upstairs, he heard Rose and the defendant arguing in the hallway. He heard Rose say, "Johnny, you're going — you're going to your brother's house." Lance further testified that as

they were walking downstairs, Lance heard the defendant tell Rose, "If I can't have you, no one can."

The argument continued downstairs, with the defendant again asking if he could stay and Rose again denying the request. At that point, Rose told Linda it was time to leave and told the defendant she was going to take him home. Linda and Rose then told Lance, who was to watch the baby, that they were leaving, and the three adults walked out to the car. Linda testified that the defendant was quiet as they approached the car and that there was no yelling, screaming, or fit of anger at this point. Lance, however, testified that he heard screaming coming from the driveway, which caused him to look out the bedroom window.

In any event, Rose got into the driver's seat of the car; Linda sat in the front passenger-side seat; and the defendant got into the backseat behind Linda. As Rose put the key in the ignition, Linda heard a scream and two noises that sounded like "a firecracker." Lance testified that he heard five or six "firecrackers" from the upstairs bedroom. Linda placed her hands behind her head to protect herself and then turned to the defendant and asked, "John, why did you hit Rose and I?" Linda then saw that Rose was bleeding from the mouth, and she jumped out of the car and instructed Lance, who was coming from the house, to call the police.

Emergency personnel arrived shortly thereafter. The defendant was gone by this time, though neither Linda nor Lance remembered seeing him leave the scene. The defendant turned himself over to authorities in Missoula, Montana, on December 31, 1989. He subsequently waived his right to extradition and was returned to Nebraska for trial.

A pathologist who performed the autopsy on Rose testified that she sustained two gunshot wounds to the head, one of which resulted in multiple fractures and a right subdural hemorrhage and caused her death. Linda survived despite suffering three gunshot wounds to the back of her head as well as wounds to her hands.

Linda testified that she did not see the defendant with a gun at any time on December 29. However, she did testify to seeing him with a small handgun during the time he lived with her. She

testified that she saw the defendant remove the gun from under a cushion on the couch where he slept. Linda further testified that on December 18, the defendant discharged the gun inside her house in front of Lance. She also testified that on December 28, the day before the occurrence at issue, the defendant discharged the gun into the air as Rose was driving down the street with Marie and Lance.

## ASSIGNMENTS OF ERROR

On appeal, the defendant argues (1) that the evidence is insufficient as a matter of law to sustain the convictions of second degree murder and attempted second degree murder and (2) that the trial court erred in admitting testimony regarding his discharge of a handgun during the days and weeks prior to the shootings.

## SUFFICIENCY OF THE EVIDENCE

As previously noted, the State charged the defendant in this case with one count of first degree murder and one count of attempted first degree murder. A person commits first degree murder by killing another purposely and with deliberate and premeditated malice. § 28-303(1). The trial court found that the State failed to carry its burden of proving that the shootings were premeditated and therefore did not convict the defendant of these two crimes. The trial court did, however, find that the shootings were intentional and, accordingly, found the defendant guilty of the lesser-included offenses of second degree murder and attempted second degree murder. § 28-304(1). For his first assignment of error, the defendant argues that the evidence is insufficient to sustain these convictions.

As an initial matter, we note the defendant's contention that "the Due Process Clause of the Fourteenth Amendment requires that the prosecution prove beyond a reasonable doubt the absence of heat of passion in order to obtain a conviction for Second Degree Murder." Brief for appellant at 13. The defendant relies heavily upon the U.S. Supreme Court's decision in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975), for the proposition that the State carries such a burden. However, *Mullaney* involved a murder

prosecution under a statute defining the crime as the unlawful killing of another with "malice aforethought." Me. Rev. Stat. Ann. tit. 17, § 2651 (West 1964) (repealed 1976). Despite the fact that malice aforethought was an essential element of the offense, the trial court instructed the jury that it could presume the existence of malice aforethought from proof that the killing was intentional and unlawful unless the defendant proved by a preponderance of the evidence that he acted in the heat of passion. The Supreme Court held that this instruction violated the defendant's due process rights by shifting to him the burden of disproving an essential element of the crime.

In *Patterson v. New York*, 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977), the Supreme Court addressed the applicability of *Mullaney* to a scheme more similar to the one involved in this case. In *Patterson*, the defendant shot and killed his estranged wife's former fiance after finding his wife and the former fiance together. The defendant was charged with second degree murder under a New York statute defining the offense as intentionally causing the death of another. N.Y. Penal Law § 125.25(1) (McKinney 1987). The same statute provides for an affirmative defense based upon evidence that the defendant "acted under the influence of extreme emotional disturbance." *Id.* New York also recognizes the crime of manslaughter, which is defined as the intentional killing of another "under circumstances which do not constitute murder because [the defendant] acts under the influence of extreme emotional disturbance." N.Y. Penal Law § 125.20(2) (McKinney 1987). Pursuant to this scheme, the trial court instructed the jury that if it found beyond a reasonable doubt that the defendant had intentionally killed the victim, but he proved by a preponderance of the evidence that he had done so under the influence of extreme emotional disturbance, it had to find him guilty of manslaughter rather than murder. The jury found the defendant guilty of murder, and he appealed.

On appeal, the defendant argued that the New York murder statute was functionally equivalent to the one struck down in *Mullaney* and was therefore unconstitutional. The Supreme Court rejected this argument, stating:

> We cannot conclude that Patterson's conviction under

the New York law deprived him of due process of law. The crime of murder is defined by the statute . . . as causing the death of another person with intent to do so. The death, the intent to kill, and causation are the facts that the State is required to prove beyond a reasonable doubt if a person is to be convicted of murder. No further facts are either presumed or inferred in order to constitute the crime. . . .

. . . It seems to us that the State satisfied the mandate of [*In re*] *Winship*, [397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970),] that it prove beyond a reasonable doubt "every fact necessary to constitute the crime with which [Patterson was] charged."

*Patterson*, 432 U.S. at 205-06. The Court concluded that the New York Legislature's decision to impose upon the defendant the burden of proving additional circumstances which lessen his culpability does not violate due process.

Under Nebraska law, second degree murder is defined as causing the death of another intentionally, but without premeditation. § 28-304(1). The definition of manslaughter includes the intentional killing of another, without malice, upon a sudden quarrel. Neb. Rev. Stat. § 28-305(1) (Reissue 1989); *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989) (to sustain a conviction for voluntary manslaughter, the State must not only prove that the defendant killed another upon a sudden quarrel, but also that he intended to kill the other person). In order to convict a person of second degree murder, the State is required to prove all three elements—the death, the intent to kill, and causation—beyond a reasonable doubt. None of the elements is presumed upon proof of the others, nor is any element presumed in the absence of proof by the defendant of the converse of that element. As in New York, the fact that a homicide occurs "upon a sudden quarrel" is an additional circumstance which serves to mitigate an intentional killing. § 28-305(1); *Pettit, supra*.

It is clear that whether a state's homicide laws violate due process depends a great deal upon the manner in which a state defines the crime charged. *State v. Chelette*, 453 So. 2d 1282 (La. App. 1984), citing *Engle v. Isaac*, 456 U.S. 107, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982). Given the similarity between the

second degree murder and manslaughter statutes of this state and those of New York, it is by no means clear that in a prosecution for second degree murder, the burden is on the State to prove the absence of a sudden quarrel beyond a reasonable doubt. We do not decide the question, however, because even assuming the State carried such a burden, the evidence is sufficient to sustain the convictions in this case.

On a claim of insufficiency of the evidence, the Supreme Court will not set aside a guilty verdict in a criminal case if the verdict is supported by relevant evidence. *State v. Fellman*, 236 Neb. 850, 464 N.W.2d 181 (1991). In determining the sufficiency of the evidence to support a conviction, this court does not resolve conflicts of evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence. *State v. Oldfield*, 236 Neb. 433, 461 N.W.2d 554 (1990). Such matters are for the trier of fact. *Id.* When the trial of a criminal case is to the court rather than a jury, the trial court's factual findings are given the same effect as a jury verdict and will not be set aside unless clearly erroneous. *Id.*

The crime of manslaughter developed at common law in recognition of the fact that some intentional killings are committed under extenuating circumstances which mitigate, though they do not justify or excuse, the killing. *Pettit, supra.* Thus, " '[a]s a concession to human frailty,' " intentional killings which would otherwise constitute murder are reduced to voluntary manslaughter if committed " 'in the heat of passion as a result of severe provocation.' " *Id.* at 449, 445 N.W.2d at 899, quoting 2 Charles E. Torcia, Wharton's Criminal Law § 153 (14th ed. 1979).

The fact that two people argue before one intentionally kills the other does not necessarily convert the crime from murder to manslaughter. Rather, as used in § 28-305(1), a sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control. *Pettit, supra.* The question is " 'whether there existed reasonable and adequate provocation to excite the passion of the defendant and obscure and disturb his power of reasoning to the extent that he acted rashly and from passion, without due deliberation and reflection, rather than from judgment . . . .' " *Id.* at 454,

445 N.W.2d at 901, quoting *Savary v. State,* 62 Neb. 166, 87 N.W. 34 (1901). The test is an objective one. *Patterson, supra.* Qualities peculiar to the defendant which render him particularly excitable, such as intoxication, are not considered. 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 7.10(10) (1986).

With these principles in mind, we address separately the defendant's contentions that the evidence is insufficient to sustain his convictions for second degree murder and attempted second degree murder.

Rose Kimball and the defendant clearly argued prior to the shootings. However, the record indicates that this argument resulted from the defendant's anger at Rose's refusal to allow him to stay at her house. In rejecting the defendant's request, Rose explained that she did not want anyone in the house with her 2-year-old daughter except Lance. The record reveals that, to the extent Rose became angry at all, her anger resulted from the defendant's refusal to accept her initial decision and his insistence on pursuing the matter after such refusal. Given the defendant's intoxication and past romantic advances, Rose's steadfast refusal to give the defendant permission to stay does not seem unreasonable. More importantly, her behavior is certainly not the sort of "severe" provocation that would excite the passion of a reasonable person, causing the person to lose normal self-control. See *Braunie v. State,* 105 Neb. 355, 180 N.W. 567 (1920) (evidence that the victim provoked the defendant to anger, by itself, is insufficient as a matter of law to reduce a murder to manslaughter). Given the defendant's statement to the effect that if he could not have Rose, no one could, it is not seriously disputed that the defendant caused the death of Rose and intended to do so. Therefore, the trial court did not err in finding the defendant guilty of second degree murder for the death of Rose Kimball.

With regard to the shooting of Linda Meck, an additional factor is involved. In *State v. Bautista,* 193 Neb. 476, 227 N.W.2d 835 (1975), the defendant was involved in a fight with another man at a club. The defendant left briefly to take his nephew home, then returned to the club with a gun. Upon returning, the defendant encountered the other man's father,

and when the father refused to disclose his son's whereabouts, the defendant shot and killed him. The defendant was convicted of second degree murder, and he appealed, arguing that the trial court erred in failing to instruct the jury on manslaughter and provocation. This court affirmed the conviction, holding that the evidence did not support an instruction on provocation because any provocation which existed resulted from the acts of the victim's son, not the victim himself.

Here, there is no evidence that the defendant quarreled with Linda Meck at any time. Whatever provocation existed resulted from the defendant's argument with Rose, not Linda. Therefore, while the claimed provocation is as inadequate to support a manslaughter conviction for Linda's shooting as it is for Rose's, we also hold that the defendant's argument regarding the shooting of Linda must fail based upon the decision in *Bautista*. Again, noting Linda's testimony that the defendant's threatening statement was directed at both her and Rose, there is evidence that the defendant intended to kill them both. Thus, the State presented sufficient evidence to sustain the defendant's attempted second degree murder conviction for the shooting of Linda Meck. The defendant's first assignment of error is without merit.

## THE CHALLENGED TESTIMONY

For his second assignment of error, the defendant argues that the trial court erred in admitting Linda Meck's testimony regarding his discharge of a firearm on December 18 and December 28. The defendant argues that the challenged testimony is irrelevant to the critical issue in the case—his mens rea on the day of the shooting—and constitutes inadmissible evidence of his character.

Without deciding the question, we note that it is at least arguable that the defendant's discharge of a weapon as Rose Kimball drove down the street the night before her murder is relevant evidence of his intent or plan to kill her and thus is admissible under Neb. Evid. R. 401 and 404(2), Neb. Rev. Stat. §§ 27-401 and 27-404(2) (Reissue 1989). In any event,

in a bench trial of a law action, including a criminal case

tried without a jury, erroneous admission of evidence is not reversible error if other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's factual findings necessary for the judgment or decision reviewed; therefore, an appellant must show that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through use of erroneously admitted evidence in a case tried without a jury.

*State v. Lomack*, 239 Neb. 368, 370, 476 N.W.2d 237, 239 (1991).

Moreover, the defendant did not object to any of the challenged testimony at trial. A prerequisite to an appeal based upon the erroneous admission of evidence is a timely objection stating the specific grounds for the objection unless the grounds are apparent from the context. *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992), citing Neb. Evid. R. 103(1)(a), Neb. Rev. Stat. § 27-103(1)(a) (Reissue 1989). "One function of a proper objection is to direct the court's attention to questioned admissibility of particular evidence so that the court may intelligently, quickly, and correctly rule on the reception or exclusion of evidence." *Coleman*, 239 Neb. at 812, 478 N.W.2d at 357. A litigant is not entitled to silently allow the opposing party to produce evidence and then, upon entry of an adverse verdict, "wander among the Nebraska Evidence Rules" on appeal, in hopes of obtaining a reversal. *Id*. Rather, if a party fails to make a timely objection to evidence, the party waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989).

The defendant waived any objection to the challenged testimony by failing to object to it at trial, and thus his second assignment of error is also without merit. Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

FAHRNBRUCH, J., concurring in the result.

While concurring with the majority in the result reached in this case, I, nevertheless, continue to adhere to the analyses of the manslaughter statute set forth in the dissents in *State v.*

*Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989), and the analysis set forth in *State v. Batiste*, 231 Neb. 481, 437 N.W.2d 125 (1989).

BOSLAUGH, J., joins in this concurrence.