STATE OF NEBRASKA, APPELLEE, V.
EUGENE T. BUTLER, APPELLANT.
634 N.W.2d 46

Filed September 11, 2001.   No. A-00-881.

James H. Monahan and Maureen K. Monahan, of Monahan & Monahan, for appellant.

Don Stenberg, Attorney General, and Scott G. Gunem for appellee.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

SIEVERS, Judge.

Eugene T. Butler appeals his conviction for second degree assault. Butler was accused of stabbing Ronald McCart in the shoulder with a steak knife during a fistfight McCart initiated after Butler accosted McCart's wife, Angie, at a party. Because the trial court erred in its jury instruction concerning self-defense and provocation, we reverse, and remand for a new trial.

## FACTUAL BACKGROUND

An annual party called the Blues Festival was held at a cabin at Thomas Lakes in Saunders County, Nebraska, on August 7, 1999. The party attracted as many as 100 people at some time during that day. Butler and a group of friends drove from Omaha to attend the party. McCart and Angie drove from their home in Kansas City, Missouri, to attend the festival with several of their friends who resided at the lake.

That evening, Angie and Jennifer Jones were behind the cabin listening to the band when one of Butler's friends approached them and asked Angie if she would like to meet one of his friends. Angie demurred, and the man left. But about 15 minutes later, he returned with Butler. There is a dispute as to what was said, but the women claim Butler made inappropriate comments and suggestions to Angie, while Butler's friend claims Butler simply spoke to the women in a cordial manner. Angie told McCart about this interaction, and McCart told Butler's friend to quit making

"advances" toward and talking to Angie. Butler apparently was not present when McCart spoke to Butler's friend.

Shortly after Angie's brief interaction with Butler, she and Jones decided to leave the party. They walked around the side of the cabin toward their car, which was parked on the adjacent road. The women said that they saw someone in the bushes next to the road and determined that it was Butler. The women allege that after Angie asked him to leave her alone, Butler emerged from the bushes, shouted obscenities at Angie, and threw beer on her. They stated that when Angie threw the beer container back at Butler, he shoved her to the ground. The women said they escaped when a man emerged from the side of the cabin and challenged Butler's treatment of them. The women ran back to the cabin in order to find McCart and Jones' boyfriend. Butler retreated, after being chased by a group of men including McCart, to Butler's uncle's cabin, which was next door to the cabin where the festival was held. McCart went to his car, removed his sandals, and put on a pair of boots.

While in his uncle's cabin, Butler picked up a steak knife and put it in his pocket. After about 15 minutes had passed, Butler left his uncle's cabin and began to walk across the property toward picnic tables located on the edge of his uncle's lot. At about the property line separating the two lots, McCart tackled Butler from the side. McCart was on top of Butler punching him in the face when Butler stabbed McCart in the side of his shoulder. McCart retreated to a cabin on the other side of the lake, where his wound was dressed. Butler went to his uncle's cabin to call the police.

When Deputy Sheriff Eric Hummel arrived at Butler's uncle's lot, Butler met him in the yard. As Butler reported the beating he had received from McCart, Marc Snyder yelled from a crowd of about 20 to 30 people still gathered at the festival that Butler had stabbed McCart with a knife. Deputy Hummel told Butler to wait there for him while he went to call for "backup." When Deputy Hummel returned, he asked Butler to continue his statement. Butler said that he took a knife from his uncle's cabin and that he stabbed McCart in self-defense during their fight. Deputy Hummel arrested Butler for second degree assault, handcuffed him, and placed him in the back of his patrol car.

Several deputies arrived at the scene. Deputy Hummel directed one of them to search the area for the knife used in the assault. Deputy Hummel approached the patrol car and asked Butler about the location of the knife, which Butler described as having a wood or black plastic handle. At no time did Deputy Hummel give *Miranda* warnings to Butler. The deputy assigned to search the area found a black-handled steak knife with the blade stuck in the space between the slats of a picnic table located near the property line on Butler's uncle's lot. There were no visible traces of blood on the knife, and it is not known whether this knife was used to stab McCart. However, the deputy also found bloodstains on the grass within a few feet of the picnic table. Deputy Hummel had sent two other deputies to the cabin where McCart was receiving treatment to interview him and other witnesses to the evening's events. One of the deputies radioed Deputy Hummel to report their findings, and Deputy Hummel instructed them to issue a citation charging McCart with third degree assault. Snyder's wife drove McCart to a hospital for treatment of his wound. McCart later pled guilty to a reduced charge of disturbing the peace.

## PROCEDURAL BACKGROUND

The State filed a complaint against Butler in Saunders County Court on August 10, 1999, charging him with second degree assault, a Class IIIA felony. The county court held a preliminary hearing September 29. In its preliminary hearing order of the same date, the court bound Butler over to the district court. On October 1, the State filed an information against Butler in the district court for Saunders County charging him with second degree assault.

Three days later, Butler filed a motion to suppress all statements he made to all officers of the State because the statements were not freely and voluntarily given and because he made them without being informed of his constitutional rights. Testimony at the suppression hearing was that Butler told Deputy Hummel he stabbed McCart in self-defense and gave a description of the knife he used and that after he was formally arrested and handcuffed, he made statements regarding the knife's location. The court overruled the motion to suppress in a journal entry filed March 1, 2000, finding that Butler was not in custody when

Deputy Hummel instructed him to remain where he was after Snyder volunteered from the crowd that Butler stabbed McCart. The court wrote: "There can be no reasonable inference of 'custody' . . . drawn from the circumstances wherein an officer says 'wait here' and then leaves to interview another person." The court also found that preliminary crime scene investigation does not constitute custodial interrogation.

Butler filed a supplemental motion for discovery, specifically requesting the right to depose Snyder. The district court overruled this motion in a journal entry filed March 20, 2000. Butler filed a motion in limine. He requested that the court prohibit the State from making statements, introducing evidence or witnesses, or asking any questions in the jury's presence regarding the steak knife taken at the scene. A hearing on the motion was held May 1. The court sustained Butler's motion with respect to this issue, thereby prohibiting use of the knife in the State's case in chief, unless the defense first raised the subject. The court memorialized its ruling in a journal entry that day.

On May 8, 2000, Butler filed a motion to dismiss the complaint and information against him because he was not granted a speedy trial. In a journal entry filed May 9, the district court overruled this motion, finding that "a minimum of 64 days remain in which defendant can be brought to trial."

Trial was held on May 9, 2000. McCart was not present to testify, nor was his deposition of December 29, 1999, placed in evidence. Snyder testified for the State. He said that he saw several people chasing Butler away from the party. He also said that when Angie told McCart that Butler threw beer on her and shoved her to the ground, McCart went looking for Butler. Snyder testified that he saw the fight between Butler and McCart, including the stabbing, and that he informed Deputy Hummel of the stabbing during the deputy's conversation with Butler.

One of Butler's friends testified that after the fight, he picked up the steak knife Butler used to stab McCart and placed it in the kitchen sink in Butler's uncle's cabin. The deputy who found a steak knife on the picnic table testified that while searching for a weapon, he found a "weapon," which he took into evidence. Butler objected to further questioning on this matter, relying upon the court's previous ruling on his motion in limine. At a

conference outside the jury's presence, the trial court determined that the testimony revealed that Butler armed himself with a steak knife, that a witness viewed the stabbing, and that McCart had been wounded. The court found that it was not unduly prejudicial to Butler for the State to elicit testimony that a steak knife was found near the location of the stabbing. However, the trial court would not allow that knife to be placed in evidence. Nonetheless, the court did allow into evidence a photograph of the steak knife lying on the picnic table where a deputy found it.

At the end of the State's case in chief, Butler moved to dismiss the case on the ground of insufficient evidence. In arguing this point, he cited McCart's failure to testify. The trial court overruled this motion. The trial continued on May 10, 2000. At the close of evidence, the court again overruled Butler's motion to dismiss, made on the ground that if Butler did stab McCart, he did so in self-defense. In response to Butler's argument, the trial judge stated that "we have a real question as to whether or not the force that was used in response to the force that was used in the attack, we have that question of reasonableness, whether it was reasonable for the defendant to use a knife in response to the attack."

At the jury instruction conference, Butler's counsel submitted proposed jury instruction No. 8, addressing the issue of self-defense. In tendering the final jury instructions, the trial court noted that it refused Butler's proposed instruction because the evidence showed that the court should include the "deadly force self-defense instruction." This instruction allowed the jury to consider Butler's provocation of McCart.

On May 10, 2000, the jury returned a verdict finding Butler guilty of second degree assault. The trial court ordered a presentence investigation, and McCart's deposition was included in the presentence investigation report. Butler filed a motion for new trial, and a hearing on the motion was held July 31. The motion for new trial was overruled on August 1. While such a motion is fraught with procedural dangers, see *State v. Nash*, 246 Neb. 1030, 524 N.W.2d 351 (1994), this appeal was filed on August 21 after the sentencing of that day, and thus it is timely. Butler was sentenced to 7 days in jail and 2 years' intensive supervised probation.

## ASSIGNMENTS OF ERROR

Butler assigns, restated and reordered, that the trial court erred in failing to (1) suppress a statement he made to law enforcement officers; (2) grant his motion for supplemental discovery; (3) keep certain physical evidence and testimony, to which Butler objected, out of evidence; (4) dismiss the case under the speedy trial statute; (5) dismiss the case at the end of the State's case in chief and at the close of evidence because the State failed to produce all " 'Res Jestae [sic] Witnesses' "; and (6) properly instruct the jury.

Butler also alleges that the judgment and verdict are not sustained by the evidence and are contrary to law, and he assigns error to the court's failure to sustain his motion for new trial. However, Butler did not argue these two assignments of error. Errors that are assigned but not argued will not be addressed by an appellate court, *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000), and we discuss these matters no further.

## STANDARD OF REVIEW

The standard of review applicable to a particular assignment of error will be set forth in the discussion of that assignment.

## ANALYSIS

*Motion to Suppress Statement.*

Butler argues that he was in custody when he made statements to Deputy Hummel without the benefit of being advised of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and that such statements should have been suppressed.

In reviewing a motion to suppress statements to determine whether an individual was "in custody" for purposes of *Miranda*, findings of fact as to the circumstances surrounding the interrogation are reviewed for clear error, and the determination of whether a reasonable person would have felt that he or she was or was not at liberty to terminate the interrogation and leave is reviewed de novo. *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615 (2000). In *Burdette*, the Nebraska Supreme Court recognized:

The U.S. Supreme Court held in *Miranda[, supra]*, that in order to safeguard the uncounseled individual's Fifth

Amendment privilege against self-incrimination, suspects interrogated while in police custody must be told that they have the right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation.

259 Neb. at 698-99, 611 N.W.2d at 631.

The *Burdette* court also recognized that the U.S. Supreme Court in *Thompson v. Keohane*, 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995), set forth the standards governing a state court's determination of when an individual is " 'in custody.' " *State v. Burdette*, 259 Neb. at 699, 611 N.W.2d at 632. Two discrete inquiries are essential to the determination: (1) an assessment of the circumstances surrounding the interrogation and (2) whether a reasonable person would have felt that he or she was or was not at liberty to terminate the interrogation and leave. *Id.* The first inquiry is distinctly factual, while the second calls for application of the controlling legal standard to the historical facts. *Id.*

■ Butler claims that the totality of the circumstances indicate that he was not free to leave the scene after Deputy Hummel heard Snyder say that Butler had stabbed McCart, because Deputy Hummel told Butler to wait on his uncle's lot until Deputy Hummel called for officer support. Under *Thompson v. Keohane, supra,* our first inquiry when determining whether Butler was in custody when he admitted to Deputy Hummel that he stabbed McCart is examining the circumstances, including determining whether an interrogation occurred. Deputy Hummel testified that after he called for backup, he returned to where Butler was waiting for him and asked Butler to continue telling him what happened. At that time, Butler admitted to stabbing McCart, but said he did it in self-defense. " ' "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. . . ." ' " *State v. Melton,* 239 Neb. 506, 510, 476 N.W.2d 842, 844 (1991), quoting *In re Interest of Durand,* 206 Neb. 415, 293 N.W.2d 383 (1980). A court may infer questioning has occurred when a police officer asks a person who has made a statement to provide more details. Although the record does not show what specific questions

Deputy Hummel asked Butler, Deputy Hummel acknowledged at the suppression hearing that during Butler's statement, he probably asked Butler for details. We think the record clearly allows the inference that there was questioning, or at least its functional equivalent, about the allegation that Butler stabbed McCart. Therefore, we turn to whether Butler was in custody at that time.

Deputy Hummel and Butler testified at the suppression hearing that in their own minds, Butler was not then free to leave the scene. However, it is not what is in the minds of the suspect or the officers which is determinative, but, as we said above, whether a reasonable person would have felt at liberty to leave. Deputy Hummel also testified that he did not threaten, deceive, coerce, show his weapon, or arrest Butler, which would, of course, affect Butler's perception of the situation—as well as the "reasonable person's" perception.

In *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615 (2000), the court said that police officers are not required to administer *Miranda* warnings to everyone whom they question, or simply because the questioning takes place in a police station, or because the questioned person is one whom the police suspect. See, also, *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995). One is in custody for *Miranda* purposes when there is a formal arrest or a restraint on one's freedom of movement of the degree associated with such an arrest. *State v. Burdette, supra; State v. Cody, supra.* We recall that the police were there at Butler's summons, that Butler was not formally placed under arrest, and that he was not handcuffed or at a police station.

The trial court found that there could be no reasonable inference of custody drawn from Deputy Hummel saying "wait here" to Butler. The court also found that Deputy Hummel was conducting a preliminary crime scene investigation, not a custodial interrogation, when he spoke to Butler. The Nebraska Supreme Court has said that *Miranda* procedures are not meant to preclude law enforcement personnel from performing their traditional investigatory functions, such as general on-the-scene questioning as to the facts surrounding a crime or other general questioning of citizens in the factfinding process. *State v. Bennett*, 204 Neb. 28, 281 N.W.2d 216 (1979) (defendant interviewed as material witness at hospital, after he had directed

police to murder victim at scene; defendant was not then viewed as suspect and was not in custody). See *State v. Lopez*, 249 Neb. 634, 544 N.W.2d 845 (1996) (holding that general on-the-scene questioning as to facts surrounding crime does not constitute custodial interrogation in case where police, who arrived at scene of murder and were greeted by owner of mobile home with news that victim had been shot, had not taken defendant in custody when they asked her for her name and date of birth).

However, Butler argues that once Deputy Hummel learned of the stabbing, he should have advised Butler of his *Miranda* rights because Deputy Hummel should have known that continuing to talk with Butler would likely force him to make an incriminating statement. Butler contends that he was "prodded" into making a statement regarding self-defense by Deputy Hummel's action of stopping the interrogation, calling for "backup," and only continuing the questioning after Snyder's statement that Butler stabbed McCart. Brief for appellant at 16. We take Butler's claim to be that his admission to Deputy Hummel was not voluntary. Whether a statement is voluntary or the result of State coercion or promise is a question of fact. *State v. Garza*, 241 Neb. 934, 492 N.W.2d 32 (1992). Whether a statement, admission, or confession has been freely and voluntarily made depends upon the totality of the circumstances. *State v. Melton*, 239 Neb. 506, 476 N.W.2d 842 (1991). See *State v. Garza, supra*. From all the circumstances, including the on-the-scene questioning in response to Butler's call to the police, we find that Butler was not in custody when he admitted stabbing McCart. Therefore, because Butler was not in custody, the admission he made to Deputy Hummel was voluntary.

*Motion for Supplemental Discovery.*

Butler argues that the trial court abused its discretion in refusing to allow him to depose Snyder because Snyder was the State's chief witness and only "Res Jestae [sic] Witness." We separately address the issue of res gestae witnesses later in our opinion.

Unless granted as a matter of right under the Constitution or other law, discovery is within the discretion of a trial court, whose ruling will be upheld on appeal unless the trial court has abused its discretion in the discovery ruling. *State v.*

*Tuttle*, 238 Neb. 827, 472 N.W.2d 712 (1991). See *Hoffart v. Hodge*, 9 Neb. App. 161, 609 N.W.2d 397 (2000). A court may order the taking of a deposition when it finds the testimony of the witness (1) may be material or relevant to the issue to be determined at the trial of the offense or (2) may be of assistance to the parties in the preparation of their respective cases. Neb. Rev. Stat. § 29-1917 (Reissue 1995). A trial court has the discretion to order depositions in criminal cases if the information may affect the outcome of the trial. *State v. Martinez*, 4 Neb. App. 192, 541 N.W.2d 406 (1995). Mere designation of a witness by the State does not establish materiality or relevance of the witness' testimony or its helpfulness in preparation of a criminal case for trial. *State v. Tuttle, supra.* A defendant must present some basis with a factual showing that the deponent's testimony satisfies the conditions of materiality and relevance expressed in § 29-1917(1). *State v. Tuttle, supra.*

Butler failed to explain in his motion for supplemental discovery why deposing Snyder would produce material and relevant evidence, and thus, the trial court did not abuse its discretion in overruling his motion. We further note that although a hearing on this motion took place, and Butler may have presented his reasons for deposing Snyder at that hearing, those proceedings are not in the bill of exceptions. It is incumbent upon the party appealing to present a record which supports the errors assigned. *Sindelar v. Hanel Oil, Inc.*, 254 Neb. 975, 581 N.W.2d 405 (1998). See *State v. Rubek*, 7 Neb. App. 68, 578 N.W.2d 502 (1998). While little would need to be shown to satisfy the standards set forth above for a deposition of Snyder, on this record, we cannot say that the trial court abused its discretion in denying Butler's request to depose Snyder.

*Admission of Evidence/Testimony Regarding Knife.*

Butler argues that the trial court improperly allowed a picture of a knife found near the stabbing scene to be entered into evidence when the knife itself had been excluded after a hearing on Butler's motion in limine. Butler asserts that the photograph of a knife that the State did not allege was the knife Butler used to stab McCart was not relevant to the case and that its admission into evidence prejudiced him.

■ Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Rev. Stat. § 27-401 (Reissue 1995). A photograph is admissible in evidence if the subject matter or contents are accurately depicted at a time pertinent to the inquiry and the photograph has probative value as relevant evidence. *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997). A photograph of a knife which the State does not contend was used to stab McCart is irrelevant evidence because it makes it no more or less probable that Butler stabbed McCart.

■ In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000). In determining whether error in admitting evidence was harmless, an appellate court bases its decision on the entire record in determining whether the evidence materially influenced the jury in a verdict adverse to the defendant. *Id.*

Trial testimony and evidence established rather overwhelmingly that Butler stabbed McCart. No one testified that this was not how McCart received his wound. Butler's friend testified that he saw Butler leave his uncle's cabin with a steak knife immediately before he was tackled by McCart, and another friend said he saw Butler "pull out" the knife during the fight. Snyder saw Butler stab McCart and testified that when McCart got up and walked away from the fight, he said, " 'The son of a bitch stabbed me.' " One of Butler's friends testified that after the fight, he picked up the knife and placed it in the kitchen sink in Butler's uncle's cabin. Photographs of McCart's stab wound were admitted into evidence, and the deputy who took the photographs testified that the wound was about 1 inch wide and between 1 and 2 inches deep. And, of course, Butler admitted stabbing McCart in self-defense when he spoke to Deputy Hummel, evidence which we have already found to have been properly admitted. Which particular knife was used in the stabbing is not of great consequence. Therefore, while admitting into evidence a picture of a steak knife not alleged to be the knife Butler used to stab McCart was error, it did not materially

influence the jury to render a guilty verdict on the charge of second degree assault. The error was harmless.

*Speedy Trial Statute.*

Butler argues that because after a September 29, 1999, preliminary hearing he was bound over to district court and trial was not held until 8 months later, the case should have been dismissed because he was not given a speedy trial. Ordinarily, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly erroneous. *State v. Baird*, 259 Neb. 245, 609 N.W.2d 349 (2000); *State v. Meese*, 257 Neb. 486, 599 N.W.2d 192 (1999).

Every person indicted or informed against for any offense shall be brought to trial within 6 months, and such time shall be computed as provided by Neb. Rev. Stat. § 29-1207 (Reissue 1995). The denial of a motion to discharge on speedy trial grounds affects a substantial right and, thus, is a final, appealable order. *State v. Meese, supra.* See, *State v. Jacques*, 253 Neb. 247, 570 N.W.2d 331 (1997); *State v. Rieger*, 8 Neb. App. 20, 588 N.W.2d 206 (1999). Once a trial court has overruled a defendant's motion to discharge on speedy trial grounds, the defendant must secure his or her rights to appellate review by filing a timely notice of appeal. *State v. Ward*, 257 Neb. 377, 597 N.W.2d 614 (1999). Proceedings for reversing, vacating, or modifying judgments or final orders shall be commenced within 30 days after the rendition of the judgment or making of the final order complained of. *State v. Jacques, supra*, citing Neb. Rev. Stat. § 25-1931 (Reissue 1995). See *State v. Rieger, supra.*

In *Jacques*, the trial court overruled Jacques' motion to discharge upon speedy trial grounds. The case proceeded to trial. Jacques failed to appeal the court's denial of his motion until after his conviction, more than 30 days after the trial court's order overruling his motion to discharge. The Nebraska Supreme Court held that this court correctly decided that we lacked jurisdiction to address Jacques' speedy trial claim because it was not timely appealed. Here, Butler's motion to dismiss for lack of a speedy trial was overruled by the trial court in a May 9, 2000, hearing and memorialized in a journal entry of the same date. Trial proceeded

on May 9, and the jury returned a guilty verdict on May 10. However, Butler did not appeal the denial of his motion to dismiss within 30 days of May 9. Therefore, we do not have jurisdiction to review Butler's speedy trial claim or his claim that the trial court's findings on the motion were inadequate.

*Res Gestae Witnesses (Sufficiency of Evidence).*

Butler argues that because the Nebraska Supreme Court requires the State to produce all "Res Jestae [sic] Witnesses" at a criminal trial, the State violated the Confrontation Clause of the Sixth Amendment by not producing McCart at trial, offering no explanation for his absence and not issuing a subpoena for him. Therefore, Butler submits that this case should have been dismissed at the close of the State's case in chief or at the close of all evidence. Butler also contends that because McCart did not testify, a qualified medical expert had to testify that McCart was stabbed.

A res gestae witness is one who, having been at the scene of an incident, can give a firsthand account of what happened. Black's Law Dictionary 1597 (7th ed. 1999). While Butler relies on cases from Michigan to support his argument that all res gestae witnesses must be called by the prosecution to testify, we apply Nebraska law. Nebraska cases decided within the past 10 years refer almost exclusively to res gestae with respect to the admissibility of evidence, particularly excited utterances, see *State v. Sanchez-Lahora*, 9 Neb. App. 621, 616 N.W.2d 810 (2000), and *State v. Martin*, 239 Neb. 339, 476 N.W.2d 536 (1991), or the hearsay exception for medical diagnosis and treatment, see *Vacanti v. Master Electronics Corp.*, 245 Neb. 586, 514 N.W.2d 319 (1994), and *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994). We find no recent cases addressing the issue of res gestae witnesses and only a handful that speak of res gestae with respect to evidence of "events at issue." See, *State v. Perkins*, 219 Neb. 491, 364 N.W.2d 20 (1985); *State v. Watkins*, 207 Neb. 859, 301 N.W.2d 338 (1981); *State v. Escamilla*, 193 Neb. 503, 227 N.W.2d 852 (1975); *State v. Castor*, 193 Neb. 86, 225 N.W.2d 420 (1975).

The only Nebraska case Butler cites to support his argument is *Johnson v. State*, 88 Neb. 328, 129 N.W. 281 (1911). In *Johnson*,

the trial court found that the evidence created no doubt that the allegation made against the defendant was true. The court said that the res gestae, or event at issue, was clearly proved. Thus, testimony from three witnesses whom the State endorsed upon the indictment but did not question was unnecessary. Therefore, the Nebraska Supreme Court found that it was not an abuse of discretion for the trial court to refuse to require the prosecution to call witnesses supposed to be interested in the defense. *Id.* We think the proper view of who does or does not testify is decided by the sufficiency of the evidence. On review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998). See *State v. Hiemstra*, 6 Neb. App. 940, 579 N.W.2d 550 (1998).

We find that to the extent that *Johnson* has any application, it is only for the proposition that the evidence, properly admitted, must be sufficient to sustain the conviction. Accordingly, McCart need not have testified because there was sufficient evidence, recounted earlier in this opinion, to establish the "res gestae." Butler's arguments about the evidence—produced and not produced—are resolved in the context of our well-established rules for appellate review of the sufficiency of the evidence. See *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000) (appellate court reviews evidence most favorably to State, and question is whether any rational trier of fact could have found essential elements of crime beyond reasonable doubt). Without reciting all the evidence again, we find that the evidence, taken as a whole, was sufficient to sustain the conviction.

We do, however, address Butler's insistence that *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117 (2000), means that his right to confront his accusers was abridged by the trial court's failure to require the prosecution to produce McCart at trial. It is hard to imagine a case more distinguishable from the present case than *Sheets*. In *Sheets*, the only evidence sufficient to convict the defendant was an inadmissible, tape-recorded statement from an accomplice who committed suicide shortly after implicating Sheets in a murder. Because the confession of an accomplice which incriminates a criminal defendant is deemed to be inherently unreliable, the statement lacked the particularized

guarantee of trustworthiness necessary to overcome the defendant's confrontation rights. *Id.* Here, we have eyewitness testimony from Snyder, the deputy who photographed McCart's stab wound, Butler's witnesses, and Butler himself, all of which tends to establish that Butler stabbed McCart. Butler's right to confront his accuser was not violated because the victim, McCart, did not testify at trial. (If Butler's argument were correct, all murders would go unpunished because the victims obviously cannot testify.)

*Jury Instructions/Self-Defense/Provocation.*
Butler argues that the trial court improperly instructed the jury about self-defense by allowing the jury to consider Butler's provocation of McCart, when the evidence did not show provocation. Whether a jury instruction given by a trial court is correct is a question of law. *Smith v. Fire Ins. Exch. of Los Angeles,* 261 Neb. 857, 626 N.W.2d 534 (2001); *State v. Quintana,* 261 Neb. 38, 621 N.W.2d 121 (2001). When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court. *Smith v. Fire Ins. Exch. of Los Angeles, supra.* The trial court's jury instruction No. 9 on self-defense, apparently derived from NJI2d Crim. 7.3, reads in relevant part that Butler "acted in self defense if: . . . (2) Eugene T. Butler did not provoke Ronald L. McCart to use such force against him with the intent of stabbing Ronald L. McCart in response."

Provocation is usually discussed in Nebraska case law with respect to mitigating what could be a murder conviction to the lesser offense of manslaughter. See, Neb. Rev. Stat. §§ 28-303(1) and 28-305 (Reissue 1995); *State v. Lyle,* 245 Neb. 354, 513 N.W.2d 293 (1994); *State v. Cave,* 240 Neb. 783, 484 N.W.2d 458 (1992); *State v. Morrow,* 237 Neb. 653, 467 N.W.2d 63 (1991); *State v. Vosler,* 216 Neb. 461, 345 N.W.2d 806 (1984). In *State v. Lang,* 197 Neb. 47, 246 N.W.2d 608 (1976), an assault case, the court said that the issue of whether there was justifiable provocation was an issue for the jury as the evidence was in conflict. For a killing to be manslaughter, the killing is done upon a sudden quarrel, a legally recognized and sufficient provocation, which causes a reasonable person to lose normal self-control.

See, § 28-305; *State v. Cave, supra*. In determining whether an intentional killing occurred upon a sudden quarrel, the question is whether there existed reasonable and adequate provocation to excite the passion of the defendant and obscure and disturb his power of reasoning to the extent that he acted rashly and from passion, without due deliberation and reflection, rather than from judgment. *Id.* Here, the offense is assault, rather than murder. But the analysis of provocation which mitigates an intentional killing logically applies to assault cases as well, given that the core difference between the two crimes is generally whether the victim lives or dies. Butler accosted McCart's wife two times. During the second encounter, he allegedly swore at her, threw beer on her, and shoved her onto the ground. Assuming that McCart was aware of such behavior, it could possibly be adequate provocation to cause McCart to attack Butler in a prosecution of McCart. But, we must keep in mind that McCart is not on trial and that provocation was used by the trial court in connection with Butler's claim of self-defense.

Neb. Rev. Stat. § 28-1409(4)(a) (Reissue 1995) states that the use of deadly force in self-defense is not justifiable if "[t]he actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter." Nebraska is among only a handful of states whose self-defense statute denies the defense if the defendant provokes the victim with the intent to purposely cause death or serious bodily harm to the victim in the same encounter. See, Del. Code Ann. tit. 11, § 464(e)(1) (1995); Me. Rev. Stat. Ann. tit. 17-A, § 108 (West 1999); N.H. Rev. Stat. Ann. § 627:4 (1996); N.J. Stat. Ann. § 2C:3-4 (West 2001); 18 Pa. Cons. Stat. Ann. § 505(b)(2)(I) (West 1998). To date, Nebraska appellate courts have not analyzed § 28-1409(4)(a), but New Jersey and Pennsylvania courts have interpreted the same language in their statutes.

In *State v. Bryant*, 288 N.J. Super. 27, 671 A.2d 1058 (1996), Bryant argued that the lower court erred in instructing the jury about provocation within the self-defense instruction. The court instructed, " '[I]f you find that the defendant, with the purpose of causing death or serious bodily harm to another, provoked or incited the use of force against himself in the same encounter, then the defense [of self-defense] is not available to him.' " *Id.*

at 37, 671 A.2d at 1063. Affirming Bryant's conviction for, among other things, aggravated assault and murder, the appellate court found that the trial court did not err in giving this instruction. The court explained that self-defense is only available to one who acts without fault and a person who provokes an assault cannot escape criminal liability by invoking self-defense as a defense to an injury done to another, citing *State v. Rivers*, 252 N.J. Super. 142, 599 A.2d 558 (1991).

In *Commonwealth v. Samuel*, 527 Pa. 298, 590 A.2d 1245 (1991), the question was whether Samuel forfeited his right to claim self-defense by provoking the fatal encounter. Samuel was asked by his sister to move into her apartment after she asked her estranged husband to move out. Her visibly intoxicated husband showed up unexpectedly, and after a verbal confrontation with his wife, refused to leave. Samuel was present for this exchange, and his handgun was visible. After his wife called the police, the husband went to the bedroom, retrieved a sawed-off shotgun, and confronted his wife in the hallway. Hearing his sister's screams, Samuel left the kitchen after he picked up the gun he had laid on the table, entered the hallway, and pointed his gun at the husband after the husband pointed the shotgun at him. Samuel fatally shot the husband. The trial court found Samuel guilty of voluntary manslaughter, holding that displaying his gun provoked the incidents which followed. Pennsylvania's self-defense statute contains the same language as our § 28-1409(4)(a). The Pennsylvania Supreme Court reversed the conviction because the prosecution failed to prove that Samuel provoked the incident with the intent to cause death or serious bodily injury. The court recounted that Samuel had not pointed the gun at the husband, had not assaulted him, and had not had any physical contact with him and that Samuel fired only after the husband pointed the shotgun, which he had just cocked, at Samuel. The court described the husband upon entry into the living room with the shotgun as the "aggressor" and ruled that as a matter of law, there was no provocation present to deny Samuel the defense of self-defense. *Samuel* strongly illustrates the key point which derives from a careful reading of § 28-1409(4)(a): To deprive a defendant of the defense of self-defense, the defendant's provocation must be with the intent that the defendant will then cause death

or serious bodily injury to the one that the defendant provoked, and it must all be in the same encounter.

On the evidential record before us, even assuming that Butler's actions toward Angie constitute provocation of McCart, the State failed to show that Butler behaved in this manner to provoke McCart into a fight, with the intent of causing McCart's death or serious bodily harm. In short, there is no evidence, absent the wildest speculation, that Butler accosted Angie with the purpose that McCart would be provoked so that Butler could use deadly force to seriously injure or kill McCart. As is apparent from review of the foregoing sentence, exclusion of self-defense by provocation under § 28-1409(4)(a) requires a complex chain of reasoning and behavior by Butler to the effect of "I will do these foul things to Angie so that her husband will attack me so I can then kill or injure him." Given the absence of evidence that Butler or McCart even knew each other, or had previous troubles, coupled with Butler's retreat to the safety of his uncle's property, there is no evidentiary support for allowing the jury to deny Butler the defense of self-defense because of provocation. In short, there was no evidence of that requisite intent on Butler's part.

Additionally, the language of § 28-1409(4)(a) and the facts of this case require that we consider the meaning of the words "in the same encounter." The Pennsylvania Supreme Court in *Commonwealth v. Samuel*, 527 Pa. 298, 590 A.2d 1245 (1991), addressed when an incident of provocation occurs "in the same encounter" in which the defendant was attacked. In *Samuel*, the Pennsylvania Supreme Court concluded that even if Samuel's initial display of his gun when the husband first arrived could be categorized as provocative, the balance between the parties shifted when the husband left the room to retrieve a shotgun. The subsequent confrontation between Samuel and the husband initiated a new sequence of activity in which the husband was the aggressor when he pointed the shotgun at Samuel.

Here, Butler retreated to his uncle's cabin after a group of men, including McCart, chased him from the festival after his second encounter with Angie. Fifteen minutes later, when he left his uncle's cabin and approached the picnic table located on the edge of his uncle's lot, Butler was tackled by McCart. Because of

this undisputed gap in space and time (during which McCart went to his car to put on a pair of boots and then hunted up Butler on the lot owned by Butler's uncle), there is no evidence that the fight started by McCart's tackling Butler was part of "the same encounter" as when Butler earlier accosted Angie. In short, the record fails to contain evidence that any provocation of McCart by Butler occurred in the "same encounter" which is a necessary prerequisite to the concept of denial of self-defense by provocation. And, as in *Samuel*, McCart clearly became the aggressor.

*Lesser-Included Offenses.*

Butler also assigns error to the trial court's refusal to instruct the jury on attempted second degree assault or third degree assault. Butler claims that the court ruled that if Butler requested a self-defense instruction, that it could not instruct the jury on these lesser offenses. However, the bill of exceptions shows that the court did not say this. Moreover, the record shows that Butler never objected to the court's instruction on second degree assault and never requested an instruction on lesser offenses. Failure to timely object to jury instructions prohibits a party from contending on appeal that the instructions were erroneous. *State v. Myers*, 258 Neb. 300, 603 N.W.2d 378 (1999). See *State v. George*, 3 Neb. App. 354, 527 N.W.2d 638 (1995). For these reasons, as well as the fact that the law of lesser-included offenses is well established, we do not believe it necessary to discuss these matters further, even though they could be raised at a new trial.

*Retrial.*

Upon finding error in a criminal trial, the reviewing court must determine whether the evidence presented by the State was sufficient to sustain the conviction before the cause is remanded for a new trial. *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000). The Double Jeopardy Clause does not forbid retrial so long as the sum of the evidence offered by the State and admitted by the trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117 (2000), citing *Lockhart v. Nelson*, 488 U.S. 33, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988). See *State v. Anderson,*

*supra.* The evidence was sufficient to sustain the conviction. Thus, the Double Jeopardy Clause does not prevent a retrial.

## CONCLUSION

The trial court did not abuse its discretion in overruling Butler's motions to suppress and for supplemental discovery. The speedy trial claim was not properly presented for appellate review. The trial court erred in admitting the photograph of a steak knife which the State did not prove or even contend that Butler used to stab McCart. However, it was harmless error.

The trial court committed reversible error in giving its jury instruction No. 9 on the defense of self-defense by including therein provocation. Because sufficient evidence was adduced to support the guilty verdict, the principles of double jeopardy do not prevent a new trial, which we hereby order.

REVERSED AND REMANDED FOR A NEW TRIAL.