IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. HOWELL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

SHAWN M. HOWELL, APPELLANT.

Filed April 8, 2025.    No. A-24-099.

Appeal from the District Court for Colfax County: CHRISTINA M. MARROQUIN, Judge. Affirmed.

Erik C. Klutman, of Sipple, Hansen, Emerson, Schumacher, Klutman & Valorz, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and Austin N. Relph for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

### INTRODUCTION

Shawn M. Howell was involved in an altercation outside his home with two other men who were inside a pickup truck. It was undisputed that shots were fired by Howell and shots were fired from the truck. The men inside the truck claimed Howell fired first; Howell claimed that shots came from the truck first and that he only fired in self-defense. Both men in the truck were seriously injured and required surgical intervention.

Following a jury trial in the Colfax County District Court, Howell was convicted of two counts of assault in the first degree and two counts of use of a deadly weapon to commit a felony. After he was initially sentenced, the State filed a motion to reconsider Howell's sentence on the basis that it was partially invalid. The district court subsequently vacated Howell's original sentence and resentenced him. On appeal, Howell challenges various evidentiary rulings, the

- 1 -

district court's supplemental response to the jury's question about the self-defense jury instruction, and the vacating of his sentence. He also contends there was insufficient evidence to support his convictions. We affirm.

## BACKGROUND

### CHARGES

On July 14, 2020, the State filed an information against Howell stemming from an incident that took place on or about October 16, 2019. Howell was charged with four counts: counts 1 and 2, use of a deadly weapon to commit a felony in violation of Neb. Rev. Stat. § 28-1205(1)(a) (Cum. Supp. 2024), a Class IC felony; and counts 3 and 4, assault in the first degree in violation of Neb. Rev. Stat. § 28-308(1) (Reissue 2016), a Class II felony. The two alleged victims were Eugene Virgil Ashlock (Virgil) and his son, Jonathan Cody Ashlock Pimental (Jonathan).

### MOTIONS IN LIMINE

Prior to trial, multiple motions in limine were filed. On January 31, 2022, the State filed a motion seeking to exclude evidence of Virgil's "alleged use of controlled substances prior to October 16, 2019." It claimed such evidence was not relevant and was improper character evidence and was not otherwise admissible under Neb. Rev. Stat. § 27-404 (Cum. Supp. 2024). The same day, the State filed a second motion seeking to exclude "text messages or conversations" between Virgil and Spencer Smith, who was involved in matters leading up to the shooting. The State claimed such evidence was not relevant and constituted inadmissible hearsay.

Howell filed a motion in limine on February 10, 2022. He sought to prevent the prosecution from using "[a]ny photograph, model, map, forensic scan, or any representation that does not accurately depict the circumstances that existed at the time police officers arrived at the crime scene at [Howell's] residence" on or about October 16 or 17, 2019. He claimed such evidence "may have been staged, altered, or have additional information placed by a non-qualified expert or scientific method, i.e., ballistics lines indicating location and directions of alleged firearm shots included in the forensic scans." He alleged that "these altered photographs, models, maps, forensic scans and representations are incriminating to [Howell]." He argued that "Inv. Kosiba is not a trained expert in ballistics or bullet trajectories, and that no CV was produced that indicated such expert certification." He also claimed that "Inv. Maus was the forensic mapper" and that "Inv. Maus had no specialized training in ballistics or trajectory." Howell filed another motion in limine that same day seeking to prohibit the prosecutor and witnesses from using terms such as victim, assailant, attack, attackers, assault, or aggressor. He claimed such terms were "unfairly inflammatory, prejudicial and misleading, and invade the province of the finder of fact."

On February 16, 2022, Howell filed two more motions in limine. One sought to admit evidence of Virgil's "uncharged wrongdoings or convicted crimes." He claimed Virgil's past actions "may be deemed inextricably intertwined with the crimes charged" and would be offered "to show proof of motive, opportunity, intent, preparation, planning, knowledge, identity, and/or absence of mistake or accident." For the same reasons, he also sought to admit evidence of Smith's "convicted crimes or uncharged wrongdoings." Howell claimed that Smith possessed "inherently dangerous weapons including Claymore mines and/or . . . up to 65 firearms," had "pounds of methamphetamine at his residence," and had a previous drug and assault conviction.

On February 22, 2022, the district court entered an order in response to Howell's motions in limine. The court denied Howell's request to prohibit the use of certain terms and it denied his request "regarding 404 evidence of [Virgil]." The other matters were taken under advisement.

The next day, the district court entered an order addressing, among other things, the State's motions in limine. It granted the State's motion regarding Virgil's drug use prior to the date of the incident but permitted testimony about his alleged drug use during the relevant time period. It denied the State's second motion seeking to exclude "text messages or conversations" between Virgil and Smith.

In a separate order entered on February 23, 2022, the district court addressed the remaining matters raised by Howell in his motions in limine. It determined that the admissibility of "any photograph, model, map, forensic scan or any representation that does not accurately depict the circumstances that existed at the time police officers arrived at the crime scene" would be decided at trial based upon "proper foundation." Regarding the evidence that Smith "possessed inherently dangerous weapons," and had a previous conviction for assault, it noted that while Howell sought admission of such evidence under "Rule 404, it is being offered as evidence of third-party threats to support Howell's self-defense claim that he reasonably feared Virgil" on the night of the incident. It stated,

> The . . . admissibility of third-party threats was addressed by the Nebraska Supreme Court in [*State v. Goynes*, 278 Neb. 230, 768 N.W.2d 458 (2009)]. There, the Court recognized that evidence of third-party threats [is] admissible to support a claim of self-defense if there is also evidence from which the fact finder may find that the defendant reasonably connected the victim with those threats. In the instant case, the current evidence before the Court is that [Smith] and [Howell] were engaged in a Facebook conversation on October 14, 2016 [sic]. That the argument was over payment for services rendered. That there was verbal enticement by both parties to engage in a physical confrontation, which never came to fruition. There is no[] evidence that [guns, bombs, or drugs] were involved in the conversation. There is also insufficient evidence that Howell knew about Smith's actual possession of guns, bombs[,] or drugs on the date of the offense. Even if Howell did know . . . that knowledge alone does not demonstrate a connection to why [Virgil] posed a threat to [Howell]. There is insufficient evidence to reach the conclusion that Howell reasonably connected the threats from [Smith] on October 13, 2019[,] with a threat of harm presented by [Virgil] on October 16, 2019.

The court therefore concluded that testimony "regarding Smith's possession of inherently dangerous weapons, firearms, and methamphetamine" was not admissible. And for "similar reasons," neither was the evidence of Smith's prior assault. The court further pointed out that Smith was not present at the time of the incident and "therefore could not have been the first aggressor." It added, "In the event Howell presents sufficient evidence to raise a theory of self-defense, the violent nature of a third party does not have relevance in this case to the issue of first aggressor on October 16, 2019."

On March 11, 2022, Howell filed another motion in limine seeking to exclude from evidence seven diagrams that were not produced until March 10, which was after the depositions were taken of four specific law enforcement officers. Howell claimed the exhibits portrayed his

"personal placement," "trajectories, distances, and sequences," and "shooting positions," all of which "would have been pertinent to the depositions" of the named law enforcement officers. He argued that the late production of these exhibits "approximately eleven days prior to trial" was prejudicial and he therefore sought their exclusion from trial. On March 16, the district court denied the motion.

JURY TRIAL

A 5-day jury trial commenced on March 21, 2022. The State called 16 witnesses to testify. Howell testified in his own behalf and called his wife as a witness. Over 200 exhibits, many of them photographs, were received into evidence. The Facebook messages that were received into evidence were maintained in "Universal Time Coordinated" or "UTC," which was explained during trial as a "time standard, not a time zone." It is "used worldwide . . . to synchronize world clocks." For areas observing "Daylight Savings Time, Central Time is five hours behind UTC time." Therefore, the times relevant to the Facebook messages in this case were calculated by subtracting 5 hours from the UTC time indicated in the exhibit. Some of the evidence presented at trial is set forth in this background section, while other evidence will be incorporated into our analysis later.

On October 13, 2019, Howell owned a tree removal business and hired Virgil and Smith to help him with a job. Their responsibilities included picking up "anything that fell off the tree as [Howell] cut it down" and putting it into Howell's trailer. Howell agreed to pay Virgil and Smith $100 each. During the job, Howell and Smith got into an argument about money owed to Smith for a previous job. According to Virgil, Smith and Howell "got in a slapping match . . . in the middle of the street," and Smith took the keys to Howell's truck and "jumped in his car and took off." Howell testified that he told Smith he called the police and told them he was "having some trouble with some meth heads on my job site and he just stole my keys." Later that day, Smith returned the keys to the police department. Virgil stayed and completed the job. Howell paid Virgil the $100; he did not pay Smith. Since Virgil rode with Smith to the job site, Virgil called his son, Jonathan, to pick him up. Jonathan typically "open carries" his gun, a "Smith & Wesson 9mm M&P," wherever he goes, and he brought it with him when he picked up his father.

In the days that followed, Smith and Howell exchanged a series of confrontational messages on Facebook. Smith threatened to take legal action against Howell for refusing to pay him for the previous job. He also urged Howell to "come over" and fight him. Howell responded with statements such as, "Bring all ya got I always win"; "You won't survive me"; and "You just got a death wish?" Howell also told Smith that he was a "non[-]threat." Smith engaged in a similar exchange of confrontational messages with Howell's wife on Facebook. At one point, Smith stated, "I carry I'm not afraid to eliminate a threat he's lucky he stayed in the truck but I only threatened to do anything after I was threatened that's why I pulled the keys and said ide [sic] leave and let him think about it."

On October 13, 2019 (the day of the tree removal job), Virgil messaged Howell on Facebook and requested another $100 for completing the job without Smith. Howell replied, "No more money period," and the two exchanged additional messages about Virgil's payment. The next day, Virgil sent the following text message to Smith: "A little idea in mind for a good friend

of ours outside of town here I'll talk to you in person in a little bit I'll come over." Virgil admitted that Howell lives outside of town.

Virgil and Howell did not communicate again until October 16, 2019. That afternoon, Howell made a public post on Facebook, stating, "Once someone's gone nocturnal they are basically fkd in the head for life. Nothing good goes on at night and sleeping all day is beyond stupid. Humans are not built for those hours whatsoever." Howell explained that he made these "snide comments and remarks about them being meth heads and not sleeping and being up all night and then being worthless during the day." Virgil commented in a post, "Why don't you pay me the 100 bucks you owe me?" Exhibit 166 (not dated) reflects Howell's several comments posted in response, including:

[Howell:] These [f]kn losers just scream for money until ya kill em

[Howell:] You screaming for money ain't got nothing coming fks are about to get deep impacted and lose everything

[Howell:] Y'all fucked up now!

[Howell:] I want both you terds at the same time!

[Howell:] No one[']s getting anything especially since I had to clean it up myself so I'm paying myself even more . . . [.]

At 7:51 p.m. that same day, Virgil was fishing when he received a message from Howell that stated, "Hey come get ur $100 it's yours." Virgil replied, "Where are you at?" Howell responded, "Farm." Virgil understood this to be Howell's residence, as he had been there a couple of times before. According to Howell, he was serious when he sent the messages, as he was "just kinda thinking about just paying these guys off and getting them out of our hair." He knew it was a "possibility" that Virgil would come to his house that night. Howell acknowledged posting "rude, sarcastic" messages, but explained that he was "getting pressured, and threatened, and stressed, and pushed, and pushed, and . . . at this point it had been going on for . . . three days all day long [with] these guys."

After receiving Howell's messages, Virgil drove home to drop off his girlfriend and retrieve the keys to a different truck -- a black Ford F150 registered to Jonathan (although registered to Jonathan, we will refer to it as "Virgil's truck"). While at home, Jonathan asked if he could join Virgil, and Virgil agreed. Virgil said that the two of them left for Howell's residence around "7:45, 7:30, . . . somewhere in there." It was "right at dark." Virgil drove and Jonathan was in the passenger seat. On the way there, Virgil received a call from Smith telling him that Howell was "weird, or something like that." Virgil acknowledged that Jonathan open carried a gun "all the time," that Jonathan was left-handed, and that he usually wore the "Smith & Wesson 9mm" on his left hip.

Earlier that day, Howell sent messages to other people indicating that he was actually angry with Virgil for asking for the money. For example, he messaged Smith:

[3:03 p.m.:] Well Virgil just fkd that all up

. . . .

[3:04 p.m.:] He got paid his $100 he can suck a dick for more lol

[3:05 p.m.:] Maybe we should just come after the fat team an[d] show our true selves[.]

About an hour before the shooting, Howell messaged Smith:

> [7:29 p.m.:] So what's Virgil's deal? I way over paid [sic] his fat ass and he's hitting me up like he wasn't paid he's really askin for his eye lids getting ripped back to his ears
>
> [7:30 p.m.:] Got the ole lady all fired up again an[d] now she's out for blood
>
> [7:30 p.m.:] Where's he at
>
> . . . .
>
> [7:33 p.m.:] Spent the day busting balls and come home to that makes me wanna go directly kill someone[.]

Then, right after messaging Virgil at 7:51 p.m. about coming over to get the $100, Howell sent Smith the following messages:

> [7:53 p.m.:] He's got a real big surprise when he get[s] here to get his other $100 lol
>
> [7:53 p.m.:] Sick of this money screaming bs
>
> [7:54 p.m.:] Fkrs gonna kiss the payment
>
> [7:54 p.m.:] Paid his fat ass already
>
> [7:54 p.m.:] Now I'm gonna fuck his ass up tryin to get more
>
> [7:56 p.m.:] No mood for his shit pullin so he's gonna be my therapy doll
>
> . . . .
>
> [7:58 p.m.:] He's in for one hell of a beating
>
> [7:59 p.m.:] One to[o] many gold diggers
>
> [8:00 p.m.:] I'm gonna fix that looking like an ATM thing real fkn fast
>
> [8:09 p.m.:] I think I have the right to go nuclear now
>
> [8:09 p.m.:] He think I'm some kind of sucker[.]

Smith testified that when he received these messages, he told Virgil "to be careful, that [Howell] was talking kind of crazy."

Howell also sent several text messages to his daughter on October 16, 2019. He stated,

> [8:03 p.m.:] I'm about to beat someone nearly to death
>
> [8:03 p.m.:] Some fat guy named Virgil
>
> [8:04 p.m.:] Keeps trying to extort money from us
>
> [8:04 p.m.:] He's coming to the farm cuz he thinks his trick worked
>
> [8:05 p.m.:] Thinks he's got a free $100 waiting here for him
>
> [8:05 p.m.:] He's leaving in an ambulance[.]

The daughter testified that the texts did not concern her at the time because she did not think her father was serious. She agreed that her father could be a "hothead," but that his "bark [was] worse than his bite." She learned about the incident in an article on Facebook the following day, at which time she contacted the police department and gave them the text messages. She acknowledged that she wanted to remain anonymous at that time and that she told the police that she was afraid of her father. However, at trial, she no longer felt her father was a threat and that the article she read "influenced [her] perception of what occurred that night" but "it wasn't the whole story." Howell's

daughter also indicated that her father told her about the conflict "between him and Virgil over the money" and that "these guys had been threatening him and kind of antagonizing him." She remembered that "being concerning." Howell explained that he was just "[b]lowing off steam" in those messages.

Virgil and Jonathan arrived at Howell's residence around 8:20 p.m. What happened next was in dispute. Virgil and Jonathan's testimony was largely consistent, while Howell provided a different version of the events.

Virgil testified that when they arrived at Howell's residence, he parked a short distance from the front door of the house with his headlights facing the road. He left the truck running and attempted to call Howell on Facebook, but Howell did not answer. Virgil then called Smith to ask for Howell's phone number, but Smith stated that he also used Facebook to contact Howell. After hanging up and placing his phone on the center console, Virgil turned around and saw Howell standing at the driver's side door with a pump shotgun over his shoulder. Jonathan described Howell as having the shotgun "at the low ready," with his right hand up by the trigger and his left hand "[d]own on the pump." Howell was holding the shotgun across his chest but with the "muzzle" down. Jonathan acknowledged grabbing his gun but claimed that he did not take it out of its holster. Virgil recalled asking Howell what he was going to do with the gun. In response, Howell "just stood there and looked at [him]." According to Jonathan, he told his father, "[G]o. Like, leave." Virgil then put the truck into drive and "rolled forward" a couple of feet, at which point Howell fired the shotgun. According to Jonathan, his father then "hit the gas and jerked at the same time" and the vehicle "spun around."

Virgil testified that Howell's first shot went through the driver's side door and hit him. He stated, "When he hit me with that shot, it kind of pushed me to the right. And when it did, it pulled the steering wheel and it took me off course of going up the driveway. So I had to make a U-turn in his driveway[.]" Howell then fired two more rounds. Virgil testified that Howell's second and third shots went through the front windshield of the truck, and the second shot "hit [him] across the stomach." Jonathan testified that he was hit in the chest when the "second shot came through the windshield." Jonathan then began shooting at Howell through the back window; he "blew out the back window of the truck as we were still spinning." Jonathan believed that he fired eight shots at Howell and was adamant that none of his shots went through the front windshield or the driver's side door; he testified that Howell's second and third shots went through the front windshield.

In contrast, Howell testified that he was inside feeding a rescue kitten with his wife when the truck parked with its headlights toward the house. Howell stated that he did not recognize the truck, and after waiting a few minutes, he went outside with his shotgun slung over his shoulder. As Howell approached the truck, he recognized Virgil as the driver but did not know who the passenger was. Howell testified that when he got up to the driver's side door, the passenger had a gun pointed at him. It was at chest height but not "for very long." As soon as Howell "went up there, it immediately went back down to . . . like a resting level." Howell immediately moved toward the back of the truck to get out of the way. At that point, Howell claimed that Virgil "nailed the gas," "slammed it in gear," and "[j]ust hammered it." Howell said he was getting hit with rocks from under the truck, and then he "heard something go whoosh, whooshing past . . . my ear, same time I heard a pop." He saw a "flash" in the back window of the truck. At that point, Howell tried to take cover behind his wife's truck near the house. On his way to his wife's truck, "[b]efore the

- 7 -

cookies," Howell "tried to get one off" but "didn't do a very good job" and "it went off up in the air." At this point, Howell said that the truck started doing a "cookie" and "no shots were fired in either direction, me or them." After coming out of the "cookie," it headed towards the road, and shots continued coming out of the back window. Howell then returned fire towards the back window of the truck. He testified that he shot towards the driver's side door as the truck turned onto the road. He denied ever shooting towards the front of the truck. During a jail phone call with his son, Howell admitted that he shot at the truck longer than he had to and that the last couple of shots were "fuck you" shots.

Howell's wife testified that Howell was outside checking on their birds when the truck showed up. She also testified that she was inside the house and heard "pop, pop, boom," which indicated that the pistol shots came before the shotgun shots.

Once Virgil and Jonathan got to the road, they briefly slid into the ditch and then drove towards the hospital. Virgil was injured and had trouble steering, so Jonathan had to help him drive. Jonathan called 911 and told them that they had been shot at and were headed towards the hospital. When they got to the hospital, they parked right in front of the emergency room doors. Virgil's arms were not functioning, so Jonathan helped him out of the truck. The entrance to the hospital was locked, and they could not get in. A short time later, law enforcement officers arrived and let them into the building, where they started receiving treatment. Both Virgil and Jonathan suffered serious injuries.

Meanwhile, Howell testified that he went back inside the house and told his wife to call the police. Howell's wife testified that Howell told her to, "make sure you tell them they shot at me first."

A deputy sheriff arrived at Howell's residence at approximately 8:35 p.m. He saw Howell outside, waving him down while holding a shotgun. The deputy spoke with Howell, who said that he had been shot at by Virgil. The deputy told Howell to put the shotgun down, and Howell complied. Howell then showed the deputy Virgil's tire tracks and four bullet holes in the house. The deputy testified that he also observed shotgun shells on the ground. Howell told the deputy that there were two people in the truck, but he did not know the passenger. More officers eventually arrived at Howell's residence.

Officers secured both scenes: Howell's residence and the hospital. Both scenes were then processed. Virgil's truck had damage to the front driver's side windshield and the front driver's side door just below the window. There was blood to the right of the driver's seat and on the steering wheel. A handgun was partially underneath the center console armrest. There was a black handgun holster in the back seat and another holster on the floor in the back of the truck. Investigators interviewed Howell and his wife that evening and the next day. Later, investigators interviewed Virgil and Jonathan. Investigators also obtained the relevant phone and Facebook records, as well as Howell's phone and video calls from jail.

In addition to the evidence already discussed, other notable evidence obtained from the investigation included the following. Officers obtained seven shotgun shell casings from around the area in front of Howell's house. Officers also recovered nine 9-mm bullet casings from the back compartment of Virgil's truck. Virgil's truck had apparent shotgun blasts to the driver's side door and front windshield. The spread of the blasts indicated that they were from a fairly close range. There was no blast damage to the back of Virgil's truck. Additionally, the glass in the back

seat of the truck and truck bed indicated that the back window had been shot at from the inside out.

Investigators Brad Elsea and Ron Kosiba conducted a trajectory analysis of two out of the four bullet holes in Howell's house. The other two bullet holes were not suitable for a trajectory analysis. The results indicated that the bullets were fired from the direction of the road. Much of the evidence regarding the trajectories was received into evidence over Howell's objections.

Further, Trooper Matthew Maus conducted a forensic 3D scan of the scene at Howell's residence. He testified that the scan was to scale. Maus then created various diagrams based on that scan. The diagrams included the various objects on the property, as well as identified pieces of evidence, the trajectory analyses, and other measurements. Many of the diagrams were received into evidence over Howell's objections.

Smith testified that he was a felon and was currently in prison. He first met Howell "[j]ust a few months" before the incident involving Virgil and Jonathan, both of whom he had known "maybe a year" at that time. Regarding the incident in October 2019, when Smith knew that he was not going to get paid that day, he "got upset and . . . stole [Howell's] keys." He returned the keys "that day" to the police department. Smith also acknowledged using his girlfriend's Facebook account to message people; in October 2019, he was dealing drugs and consuming drugs "[e]very day" and methamphetamine was his drug of choice. According to Smith, Virgil was "using meth with [him] daily, too." He agreed that Jonathan "always carried . . . a 9mm" and that he was "good with that gun," "[p]retty quick with it," and "went shooting quite a bit." He also agreed that "Virgil was good with guns." Smith acknowledged texting with Virgil about "a plan" and that the reference to a "little friend outside of town" meant Howell. Smith also stated that "most" of the threats in the messages he and Howell exchanged were "just false threats," but he took Howell's threat towards Virgil serious enough to warn Virgil that Howell was "talking crazy."

Following the close of the evidence, the district court held a jury instruction conference, the parties gave their closing arguments, and the case was submitted to the jury at 11:16 a.m. on March 25, 2022.

During deliberations, the jury asked multiple questions. "Juror Question #1" requested the date of the messages contained in exhibit 166 (Howell's posts following Virgil's post requesting his "100 bucks"). Following discussion with counsel, the district court, at 1:05 p.m., directed the jury to make a decision "based on what you remember of the evidence" and that no other evidence would be provided. At 3:22 p.m., the parties were notified of "Juror Question #2." It was related to Jury Instruction No. 14 (the self-defense instruction). Specifically, the jury asked, "Does provoking or inviting a person onto your property, nullify your right to use self defense if you see them draw a gun on you?" After conferring with the parties, the court responded at 3:26 p.m., "Please refer to Instruction No. 14 [']Self-Defense[.'] You should apply the facts you heard as evidence to the law as set forth in the Instructions."

At 4:08 p.m., three additional jury questions were presented to the parties, who agreed on the district court's proposed responses. The responses were provided to the jury at 4:10 p.m. "Juror Question #3" asked how long or how many days the jury would have to deliberate "before it is called a hung jury?" The response was, "There is not a limit to the time a jury can deliberate before it is determined to be a hung jury. If you believe you cannot reach a verdict you should notify the bailiff at the time you determine a verdict cannot be reached." "Juror Question #4" asked, "If we

- 9 -

don't decide on a verdict till 5:00 p.m. will we stay to deliver the verdict today?" The court's response was, "You will stay until after 5:00 p.m. today if you are still in deliberations." "Juror Question #5" asked, "If we go past 5 p.m. can we use our phones to make arrangements for child pick up?" The court's response was, "Yes. You will need to request in writing to the Bailiff your need to use your phone." At 4:29 p.m., "Juror Question #6" asked, "May I make a phone call to arrange child pick up." At 4:30 p.m., the court responded, "Yes." The court also discussed with the parties that it was going to allow the jurors to use their phones for the next 10 minutes.

At 4:35 p.m., the district court convened the parties in chambers. There was no jury question pending. However, the court referred back to "Juror Question Number 2" regarding self-defense. The court informed the parties that it had "considered a supplemental response." It pointed out that there was a typographical error (word "threat" should have been "threaten") in the given instruction. There was no objection to this correction. The court then noted that "there is case law regarding the issue of provocation." It cited to *State v. Butler*, 10 Neb. App. 537, 634 N.W.2d 46 (2001), for the proposition that "Nebraska denies the defense of self-defense if the defendant provokes the victim with the intent to purposely cause death or serious bodily harm to the victim in the same encounter." Howell objected, arguing that the jury instructions had already been provided and deliberations had already commenced. The court overruled the objection because "it is case law that applies to this specific question of provocation that is raised in their second question to the Court." The "Court's Supplemental Response to Juror Question #2" was provided to the jury at 4:41 p.m.

At 5:04 p.m., approximately 25 minutes after the district court provided the supplemental response to the jury's second question regarding self-defense, the jury returned a verdict. It found Howell guilty on all counts.

POSTTRIAL PROCEEDINGS

On April 1, 2022, Howell moved for a new trial on several grounds. He raised various evidentiary issues, argued that there was insufficient evidence to support his convictions, and argued that the district court erred by giving a supplemental response to the jury's question about the self-defense instruction. After a hearing on the matter, the district court overruled the motion.

Sentencing took place on June 15, 2022. The district court sentenced Howell to imprisonment for a period of "not less than 10 years and not more than 10 years" on each firearm conviction (counts 1 and 2, use of a deadly weapon to commit a felony); and imprisonment of "not less than 1 year and not more than 5 years" on each assault conviction (counts 3 and 4). Count 1 was to run consecutively to count 3, and count 2 was to run consecutively to count 4. Counts 1 and 2 were to run concurrently to each other, and counts 3 and 4 were to run concurrently to each other. All sentences imposed were to run concurrently to a separate sentence already being served by Howell at the time.

Thirteen days after sentencing, the State filed a motion on June 28, 2022, to reconsider Howell's sentence on the basis that the "sentence imposed on Counts 1 and 2 is invalid." At the hearing on the motion, Howell objected to the motion as being untimely filed. The district court overruled the motion and entered an order on June 30 vacating the June 15 sentencing order. Further sentencing was scheduled for August, however, Howell appealed, thus suspending further action at the trial court. This court subsequently dismissed Howell's appeal for lack of jurisdiction.

- 10 -

Following the mandate from this court dismissing Howell's appeal, the district court resentenced Howell on January 17, 2024, to not less than 8 nor more than 20 years' imprisonment on each firearm conviction and not less than 1 nor more than 5 years' imprisonment on each assault conviction. Counts 1 and 2 were to run consecutively to each other and any other sentence currently being served. Counts 3 and 4 were to run concurrently to each other and to the other sentence currently being served.

Howell appeals.

## ASSIGNMENTS OF ERROR

Howell assigns, reordered and restated, that the district court erred in (1) excluding evidence of threats made by Virgil and Smith to Howell, (2) admitting Howell's jail phone and video calls into evidence, (3) allowing officer testimony about bullet trajectory and admitting related exhibits into evidence, and (4) vacating his original sentence. Howell also assigns that (5) there was insufficient evidence to support his convictions and (6) the court erred by providing a supplemental response to the jury's question about the self-defense instruction.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Barnes*, 317 Neb. 517, 10 N.W.3d 716 (2024). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.*

Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by a trial court. *State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Kalita*, 317 Neb. 906, 12 N.W.3d 499 (2024).

## ANALYSIS

### THIRD-PARTY THREATS

Howell argues that the district court "erred in sustaining objections and excluding testimony [about Smith] and [Virgil's] plans to physically assault and rob him." Brief for appellant at 27. The State objected to such testimony on relevancy and hearsay grounds. The district court overruled the State's objections and allowed Howell to inquire about Smith and Virgil's alleged plans to "physically assault" and "rob" Howell. Specifically, the court did not exclude Howell from eliciting any testimony regarding this topic during Virgil's testimony. The court also overruled the State's hearsay objection to exhibit 214, a text message from Virgil to Smith on

October 14, 2019, that stated: "A little idea in mind for a good friend of ours outside of town here I'll talk to you in person in a little bit I'll come over."

In addition, during Smith's cross-examination, the following colloquy occurred:

[Defense Counsel]: After the tree job, and the issue with the tree job and you not getting paid, you also came up [with] a plan to get my client robbed; correct?

[State]: Objection, Your Honor. Relevance.

[Court]: Sustained.

[Defense Counsel]: Your Honor --

[Defense Counsel]: At any time had you discussed with anyone to go out and collect your money from my client?

[Smith]: Yeah.

[Defense Counsel]: Did you discuss with anyone to use force to get the money from my client?

[State]: Objection, Your Honor. Relevance.

[Defense Counsel]: It goes to motive.

[Court]: Overruled. . . . You can answer.

[Smith]: No.

[Defense Counsel]: Okay. Did you think about yourself going out there and using force to get money from my client.

[State]: Objection, Your Honor. Relevance.

[Court]: Sustained.

[Defense Counsel]: Had you gone out to my client's place to try to collect or steal things from him to get your hundred dollars?

[State]: Objection, Your Honor. Relevance.

[Court]: Overruled

[Smith]: No.

[Defense Counsel]: Had you ever taken anything around October, September time, from my client's residence?

[State]: Objection, Your Honor. Relevance.

. . . .

[Court]: The objection will be sustained. Further questions?

[Defense Counsel]: In October -- after the tree job in October, did you attempt to go out and collect your money by taking things off my client's . . . ground?

[Smith]: No.

The Nebraska Supreme Court addressed the admissibility of third-party threats in *State v. Goynes*, 278 Neb. 230, 768 N.W.2d 458 (2009). While the court did not make a definitive ruling on whether such threats are admissible in self-defense cases in Nebraska, it noted, "Other courts have held that evidence of third-party threats are admissible to support a claim of self-defense if there is also evidence from which the fact finder may find that the defendant reasonably connected the victim with those threats." *Id.* at 236, 768 N.W.2d at 463. The defendant in *Goynes* sought to introduce testimony of third-party threats to explain why he was carrying a gun on the day of the shooting and to show that the victim was the initial aggressor. The court determined that the trial

court did not err in excluding the third-party threats because the evidence did not show that the defendant reasonably feared for his life. The court further held that even if the defendant had connected the victim to the threats, his argument would still fail because he was not prejudiced by the exclusion of the threats. The court explained, "[The] evidence was before the jury even without evidence of these specific threats." *Id.*

In this case, Smith was asked about his plans to use force to obtain money from Howell. He denied discussing with anyone the use of force against Howell to get money from him. Further, there was no evidence that Howell was aware of any such plans by Smith or that Howell associated any such threats with Virgil. Howell only knew Virgil through Smith, claiming that Virgil "just started showing up around [Smith] . . . like a week before the . . . tree job that we did." Howell testified that at the time he invited Virgil to come to his place on October 16, 2019, he did not have any problems with Virgil; his problems were with Smith because he had "ratted him out for drugs." When asked if he ever saw Virgil as a threat, Howell responded, "No."

We cannot say that the district court abused its discretion in sustaining the State's objections during Smith's testimony. Moreover, even if the court had erred, Howell was not prejudiced because other admitted evidence revealed the tension and threats exchanged between Howell and Smith. In addition to the evidence described earlier related to messages between Howell and Smith, Howell also testified about threats made by Smith. According to Howell, Smith said he was "going to blow up my house," that he knew "people who would shoot up my house," and that he was "going to have [him] robbed." According to Howell, Smith said, "Fuck you, and I'll kick your ass. I'm going to come out to your place and kick your ass. And why don't you come over to my place and I'll -- I'll eff you up there." Howell said that Smith wanted to physically fight him, and that Smith called him a "snitch" for "ratting him out about the drugs." Howell also testified about Smith's threats to Howell's wife and that he was "[v]ery highly on the high alert" because he knew they were "on meth and they've got guns."

The jury was presented with considerable evidence about Smith's threats against Howell. However, the evidence also established that Smith was not present during the gunfire exchanged on the evening of October 16, 2019, and Smith denied discussing with anyone using force to collect money from Howell. Howell was not prejudiced by the exclusion of any further evidence related to threats made by Smith.

### EXHIBITS 174 AND 175

Next, Howell argues that the district court erred in admitting exhibit 174, a jail phone call (with portions redacted) between Howell and his aunt on December 14, 2019; and exhibit 175, a jail video call (with portions redacted) between Howell and his son on July 15, 2020. Both exhibits were received in the course of the testimony of a former employee of the Butler County Sheriff's Department. He had been employed there as a deputy, a sergeant, and during his last 6 years, as the Director of Corrections. In that last role, he was the facility administrator (hereafter "the administrator"). The administrator described the audio and video recording technology in place in the Butler County jail when Howell was incarcerated there. He also discussed the procedures employed upon their use, including notifications to the users at the commencement of such communications that the call or video was being recorded. The administrator testified that the redacted portions of exhibits 174 and 175 were matters not relevant to the case, and he confirmed

that besides the redacted versions, the exhibits were the same as the recording retained on the main server. The recordings were stored "in cloud-based storage on . . . servers in Omaha, [Nebraska]" and their encryption process prevents the records from being "edited, altered or doctored in any way." However, once a recording is exported from the system, it can be altered. At trial, Howell objected to both exhibits on the basis of foundation and hearsay. His only argument in support of his objections was, "We just heard about two people on these tapes." The court overruled the objection, and the exhibits were published to the jury.

The recorded conversation between Howell and his aunt (exhibit 174) is approximately 2½ minutes. Although Howell's aunt did tell Howell that he should have gone into the house to stay safe or should not have gone outside, Howell's responses supported his self-defense position presented at trial. He told his aunt that he let the others fire a "couple shots" before he returned fire. He also explained that he could not get back into the house because when he got to the truck, "they unloaded."

The recorded conversation between Howell and his son (exhibit 175) is just under 5½ minutes. Howell's son never said or asked anything incriminating for Howell; rather, once again, although Howell's comments were sometimes crude, including describing his last two shots as "fuck you shots," he again stated that when the "driver punched it," they started shooting at him and he claimed that he still did not shoot even though he had a "green light" once the gun was pointed at him.

At the hearing on Howell's motion for new trial, he again challenged the admission of these exhibits. As for exhibit 174, he argued that Howell's aunt was never called as a witness and that the conversation "was put into evidence through the jail administrator." He argued that the aunt's statements were hearsay and were prejudicial to Howell. Regarding exhibit 175, Howell argued that his son was never called to testify and his son "made certain statements" during the video call that were hearsay and "were highly prejudicial" to Howell. Howell did not specify what statements by the son were prejudicial. He again argued that this evidence was introduced by the "jail administrator" the State called as a witness.

On appeal, Howell argues that the admission of exhibits 174 and 175 violated his constitutional rights to confrontation and cross-examination, that they were incomplete, and that they were not sufficiently authenticated. He contends that since Howell's aunt and son were not listed as endorsed witnesses, they were not deposed, and Howell was unable to cross-examine them. This therefore violated his "right to confrontation." Brief for appellant at 30. Howell also claims that the State "failed to meet its burden of authentication." *Id*. He argues that the administrator "did not know how much was redacted" from each recording, and therefore, "foundation on authenticity was not met" and the exhibits should have been excluded. *Id*. at 31.

The State counters that this assignment of error is not properly before us on appeal because Howell objected only on foundation and hearsay grounds. It cites to *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016), for the proposition that a foundation objection is a general objection, which requires the court to engage in interpretation on appeal, rather than be apprised of the real basis for the objection. Thus, a party may not normally complain on appeal for an overruled foundation objection unless the grounds for the exclusion are obvious without stating it. *Id.* See, also, *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021) (objection must be specifically stated,

and on appeal, defendant may not assert different ground for his or her objection to admission of evidence than was offered to trier of fact.).

In this case, Howell's only argument made in support of his general foundation and hearsay objections at trial related more to the lack of notice about the "two people on these tapes." Regardless, even considering Howell's authentication argument on appeal, we cannot say the district court abused its discretion in admitting exhibits 174 and 175. A document is properly authenticated by evidence to support a finding that the matter in question is what its proponent claims. *State v. Smith, supra*. The administrator provided substantial testimony regarding how the jail recordings were made, stored, and retrieved, and confirmed that exhibits 174 and 175 were what they were purported to be.

Howell does not specifically argue about his objections based on hearsay and he only generally alleges that "these statements were highly prejudicial" to him. Brief for appellant at 31. As set forth above, these recordings favored Howell's self-defense claim; in both recordings, Howell reiterated his position that the shots from the vehicle came before he returned fire. Although his language and attitude may have had some detrimental effect, there was substantial other admitted evidence revealing similar crude language and attitude. Therefore, to the extent there was any error in the admission of exhibits 174 and 175, it was harmless.

OPINION TESTIMONY AND EXHIBITS

Howell also argues that the district court erred in permitting the testimony about bullet trajectory and corresponding exhibits as provided by Investigator Elsea, Trooper Maus, and Investigator Kosiba; all were employed by the Nebraska State Patrol. He challenges the admission of exhibits 53 through 58, 154, 155, 157, and 158. Howell contends the court erred in allowing these law enforcement officers to give "lay or expert opinion testimony as to bullet trajectory and location of gun shots from trajectory assessments." Brief for appellant at 33.

At trial, investigator Elsea testified that he had "been through shooting reconstruction school" where he was taught about the "trajectory of bullets" and how to use a "trajectory kit, be able to determine the general direction of travel of a bullet, as well as a potential angle . . . of entry into a certain medium." He took this training in October 2019, which was "[t]he week before" the incident in this case. The training he attended was 40 hours, although the trajectory training was for "two-and-a-half, almost three days." He received a "certification of completion" for the course. He indicated that investigator Kosiba also took the training with him. Investigator Elsea acknowledged that he was not a ballistics expert and had no "special certifications besides a class certification in trajectory" that he took the week before the incident. This was his "[f]irst shooting case." He also acknowledged that he was not a forensic scientist, did not have a degree in forensic science, was not an accident reconstructionist, and "never wrote an expert report, or a report in this case besides an investigative report." He did not provide "any detailed report" as to how he determined trajectory, but he did include the findings of his trajectory assessment. The investigator clarified that when he did the trajectory assessment, he did not determine the angle of the bullet going into the house; rather, only "directionality" was determined. He acknowledged that the angle of a bullet's entry is "one piece to trajectory assessment," but he did not do that in this case.

Investigator Elsea was called to the scene of the October 16, 2019, incident to "help them process the scene of the shooting." He and investigator Kosiba "did a trajectory assessment of two

of the bullet holes on the side of the house." Photos of the four bullet holes in the side of the house were received without objection. After explaining the procedure for determining the trajectory of the bullet holes, investigator Elsea testified that his conclusion was that when they "illuminated the laser," the trajectory of two of the bullet holes "pointed towards the driveway, end of the driveway." At that point, Howell objected "on foundation," and was overruled. The investigator was asked to look at exhibits 53, 54, and 55. He testified, without objection, that the photos of the "trajectory laser we used on the residence that night" "showed the laser pointing towards the driveway." When asked if the photos "fairly and accurately depict the trajectory assessment laser," he responded, "Yes." The State then offered the exhibits. Howell again objected "to foundation." The objection was overruled. The investigator then testified as to what each photo depicted. He was provided exhibits 56 and 57. These were photos of another bullet located in the side of the house that showed the trajectory of that bullet, "the beginning and end points." The State offered those exhibits, to which Howell objected on foundation. The objection was overruled. Investigator Elsea then described the photos as showing the trajectory "towards the end of the driveway." Exhibits 58 and 59, photos of the bullet hole from which a bullet was removed from the side of the house, were offered and received without objection. The investigator also testified about the 9-mm shell cases that were found, agreeing that "there were at least nine found."

Trooper Maus was experienced in "forensic mapping," which he explained was "utilizing tools and equipment to create two-scale diagrams of a particular scene . . . to help . . . juries and the judges . . . understand what that scene particularly looked like for that particular case." Trooper Maus was a certified forensic mapper and was able to do "3D scanning scenes very similar to what is seen" on television shows. The trooper described the equipment used to create 3D images, as well as the software used to interpret the data and to "build a 3D map or diagram of a particular scene." Trooper Maus provided substantial details on the process used to create a 3D scan. He then described the steps taken to create 3D scans at the scene of the incident. Trooper Maus was asked to look at exhibits 154 and 155, which were diagrams based on the 3D scan, and which accurately depicted the scene. When the State offered these exhibits, Howell objected to "foundation, speculation." The objection was overruled. Regarding exhibits 157 and 158, the trooper explained that these were "two 2D images of trajectory of the bullet hole" using photographs and trajectories that were done by the "[i]nvestigative [s]ervices team on the night" of the incident. Exhibit 157 was a close up of exhibit 158, and it was a "top-down view of the bullet trajectories that were done by other investigators." When the State offered these exhibits, Howell objected "on foundation, hearsay, relevancy." The objection was overruled.

Investigator Kosiba was currently a drug investigator, but he had worked in the criminal division. He has been certified as a law enforcement officer in Nebraska since 1990. He also participated in the training in trajectory assessment the week before the October 16, 2019, incident. He took photographs and video of Virgil's truck at the hospital, as well as at Howell's residence. Investigator Kosiba was involved with the bullet hole trajectory analysis. He explained that the trajectory line shows "hypothetically" where the bullet came from and that someone could have fired somewhere along that trajectory line. He indicated that the bullet could have come from up close to the house or further out.

The State argues that Howell did not preserve this issue for appellate review, and we agree. A review of the record shows that Howell did not object to exhibit 58 or to the relevant portions

of Kosiba and Maus's testimony (he objected to various exhibits during their testimony but not to the testimony itself). Therefore, Howell's challenges to that evidence are not preserved for appellate review. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018) (failure to make timely objection waives right to assert prejudicial error on appeal).

While Howell did object to the rest of the challenged evidence, he objected primarily on foundation grounds (exhibits 53 through 57, 154, 155, 157, and 158), as well as a few times on speculation (exhibits 154 and 155), hearsay (exhibits 157 and 158), and relevancy (exhibits 157 and 158) grounds. We conclude that these objections do not preserve the issue for appellate review. See *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021) ("An objection must be specifically stated, and on appeal, a defendant may not assert a different ground for his or her objection to the admission of evidence than was offered to the trier of fact."). See, also, *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017) (concluding that foundation and relevance objections were not sufficient to preserve for appellate review arguments that witness was not properly qualified and that court did not follow proper procedure in determining whether expert testimony was admissible).

SENTENCING ORDER

Howell was charged with four counts: counts 1 and 2 for use of a deadly weapon (firearm) to commit a felony in violation of § 28-1205(1)(a), a Class IC felony; and counts 3 and 4 for assault in the first degree in violation of § 28-308(1), a Class II felony. A Class IC felony is punishable by a mandatory minimum of 5 years' imprisonment and up to 50 years' imprisonment; a Class II felony is punishable by 1 to 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024). Importantly, sentences imposed under § 28-1205 "shall be treated as separate and distinct offenses from the felony being committed, and sentences imposed under this section shall be consecutive to any other sentence imposed." § 28-1205(3). Additionally, Neb. Rev. Stat. § 29-2204 (Reissue 2016) provides that except for when a term of life imprisonment is required by law, "in imposing a sentence upon an offender for any class of felony other than a Class III, IIIA, or IV felony, the court shall fix the minimum and the maximum terms of the sentence to be served within the limits provided by law." Additionally, the "minimum term fixed by the court shall be any term of years less than the maximum term imposed by the court," § 29-2204(1)(a), or the "minimum term shall be the minimum provided by law," § 29-2204(1)(b). The minimum term for a Class IC felony is a mandatory 5 years' imprisonment; a Class II felony requires a minimum 1 year of imprisonment.

Howell was initially sentenced on June 15, 2022. He was sentenced to imprisonment for a period of "not less than 10 years and not more than 10 years" on each firearm conviction (counts 1 and 2, use of a deadly weapon to commit a felony); and imprisonment of "not less than 1 year and not more than 5 years" on each assault conviction (counts 3 and 4). Counts 1 and 2 were to run concurrently to each other, and counts 3 and 4 were to run concurrently to each other. The firearm sentences were to run consecutively to the assault sentences, and all sentences were to run concurrently to a separate sentence already being served by Howell at the time. The assault sentences were consistent with the law. However, the firearm sentences were both erroneous in that the minimum sentences were not consistent with § 29-2204(1)(a) or (b), and those sentences

- 17 -

could not be run concurrently with each other or with the other sentences in accordance with § 28-1205(3).

Thirteen days after the original sentencing order was entered, the State filed a motion on June 28 asking the court to reconsider Howell's sentences on the basis that it was partially invalid. The district court granted the motion and vacated Howell's original sentence on June 30, 2023. On January 17, 2024, it resentenced Howell to not less than 8 nor more than 20 years' imprisonment on each firearm conviction and not less than 1 nor more than 5 years' imprisonment on each assault conviction. The firearm sentences were ordered to run consecutively to each other and any other sentences being served. The assault sentences remained the same and were to remain concurrent with each other and the other sentence currently being serve; this was consistent with the original sentencing order.

Howell argues that the district court erred in vacating the June 15, 2022, sentencing order because the State's motion to reconsider was not timely filed. He seeks the reinstatement of the June 15 sentencing order. He contends that any such motion had to be filed within 10 days of the court's sentencing order, and in this case, he claims that the State's motion was untimely filed.

However, the timing of the State's motion is not relevant to when a district court may or may not modify a sentence. A sentence validly imposed takes effect from the time it is pronounced. *State v. Lessley*, 301 Neb. 734, 919 N.W.2d 884 (2018). When a valid sentence has been put into execution, the trial court cannot modify, amend, or revise it in any way, either during or after the term or session of court at which the sentence was imposed. *Id.* Any attempt to do so is of no effect, and the original sentence remains in force. *Id.* The circumstances under which a judge may correct an inadvertent mispronouncement of a sentence are limited to those instances in which it is clear that the defendant has not yet left the courtroom; it is obvious that the judge, in correcting his or her language, did not change in any manner the sentence originally intended; and no written notation of the inadvertently mispronounced sentence was made in the records of the court. *Id.*

However, where a portion of the sentence is valid and a portion is invalid or erroneous, the court has authority to modify or revise the sentence by removing the invalid or erroneous portion of the sentence if the remaining portion of the sentence constitutes a complete valid sentence. *State v. McDermott*, 200 Neb. 337, 263 N.W.2d 482 (1978). See, also, *State v. Lessley, supra* (sentence of 20 to 20 years' imprisonment for first-degree assault, Class II felony, was erroneous because the minimum and maximum terms were the same and did not comply with either § 29-2204(1)(a) or (b); district court properly modified sentence to 20 to 20 years plus 1 day).

In the present case, as previously indicated, the June 15, 2022, sentencing order was valid as to Howell's assault sentences. Therefore, the district court did not have the authority in its June 30 order to vacate this portion of Howell's original sentence. The court did have the authority, however, to vacate the invalid portions of its original sentencing order. Both the minimum term and the references to the firearm sentences being served concurrently were invalid. Accordingly, the January 17, 2024, order properly modified the previously invalid portions of the June 15, 2022, sentencing order. The fact that it simply restated the previously valid sentences for the assault convictions is of no consequence.

Howell contends that the evidence was insufficient to sustain his convictions as to all charges. He argues that the evidence "did not prove beyond a reasonable doubt that [he] did not act in self-defense." Brief for appellant at 37. He does not dispute that he exited his home with a shotgun. And he claims that there was "voluminous testimony that Jonathan had a handgun in his holster on his hip" when he came to Howell's home. *Id*. at 38. "Another undisputed fact is that both [Howell] and Jonathan exchanged gun fire." *Id*. He claims he "retreated for cover to his wife's truck at his residence during the gunfight" and that he was "in fear of his life, after seeing a gun pointed at him." *Id*. Howell then proceeds to describe the conflicting evidence heard by the jury and argues about the credibility of Virgil and Jonathan.

Assault in the first degree occurs when a person "intentionally or knowingly causes serious bodily injury to another person." § 28-308(1). At trial, Howell did not dispute that he intentionally caused seriously bodily injury to Virgil and Jonathan, but he argued that his actions were justified by self-defense. He argues on appeal that "the State did not prove beyond a reasonable doubt that [Howell] did not act in self-defense." Brief for appellant at 40. We therefore focus our attention on Howell's arguments related to his claim of self-defense.

Nebraska's self-defense statute, Neb. Rev. Stat. § 28-1409 (Reissue 2016), provides, in relevant part:

(1) . . . [T]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

. . . .

(4) The use of deadly force shall not be justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily harm . . . nor is it justifiable if:

(a) The actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating . . ., except that:

(i) The actor shall not be obligated to retreat from his dwelling . . . , unless he was the initial aggressor . . .

. . . .

(5) Except as required by subsections (3) and (4) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used, without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action.

"Deadly force" is defined as "force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm." Neb. Rev. Stat. § 28-1406(3) (Reissue 2016). Section 28-1409 has been interpreted to mean that to successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force, and the force used in defense must be immediately necessary

and justified under the circumstances. *State v. Johnson*, 314 Neb. 20, 988 N.W.2d 159 (2023). See, also, *State v. Schroeder*, 199 Neb. 822, 261 N.W.2d 759 (1978) (general rule is that words alone are not sufficient justification for assault),

Howell had the initial burden of going forward with evidence of self-defense; after he did so, the State had the burden to prove that he did not act in self-defense. See *State v. Kipple*, 310 Neb. 654, 968 N.W.2d 613 (2022) (in absence of statute placing burden of proving affirmative defense on defendant in criminal case, defendant has initial burden of going forward with evidence of defense, and once defendant has produced sufficient evidence to raise defense, issue becomes one which state must disprove).

Howell claimed that when he got up to the driver's side door of the truck, the passenger had a gun pointed at him, although he also acknowledged that the gun was at chest height but not "for very long," and as soon as Howell "went up there, it immediately went back down to . . . like a resting level." Howell immediately moved toward the back of the truck to get out of the way. He testified that Virgil then "nailed the gas," and Howell was hit by rocks from under the truck. He heard something "go whoosh" past his ear and at the same time he "heard a pop." As Howell headed towards his wife's truck, he "tried to get one off" but the shot "went off up in the air."

However, Virgil and Jonathan testified differently, claiming that as Virgil let the truck roll forward, Howell fired the first shot. Virgil then "hit the gas and jerked at the same time" and the vehicle "spun around." Virgil testified that he was hit by Howell's first shot through the driver's side door, and that Howell's second and third shots went through the front windshield. Jonathan was hit in the chest when the second shot came through the windshield, at which point he began shooting at Howell through the back window of the truck.

In this case, for the jury to believe that Howell acted in self-defense, they would have had to believe that Jonathan fired the first shot. However, if the jury determined that Howell fired the first shot, thus provoking Jonathan to fire back at him, then there was sufficient evidence for a rational trier of fact to find that Howell did not act in self-defense. In reviewing a criminal conviction for a sufficiency of the evidence claim, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finders of fact. *State v. Kalita*, 317 Neb. 906, 12 N.W.3d 499 (2024). After viewing the evidence in the light most favorable to the prosecution, an appellate court must consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *id*. We conclude the evidence sufficiently establishes that Howell walked up to Virgil's vehicle with a shotgun "at the low ready," saw Jonathan with a handgun initially raised but immediately lowered to a "resting level," at which point Howell moved towards the back of the truck and fired a shot. Virgil and Jonathan claimed that first shot hit the driver's side door of the truck and that a second shot came through the front windshield of the truck, hitting Virgil in the stomach and Jonathan in the chest.

It was for the jury to decide who to believe in terms of who fired the first shot. In reaching that decision, the jury had to make its own determination about the credibility of the witnesses. There was also other evidence regarding Howell's messages to his daughter and to Smith prior to the incident, which may have cast serious doubt on his self-defense claim and may have persuaded the jury that Howell fired the first shot to provoke the exchange of gunfire. He had messaged Smith earlier, stating, "[Virgil's] got a real big surprise when he get[s] here to get his other $100 lol."

Further, he messaged his daughter, "I'm about to beat someone nearly to death . . . [s]ome fat guy named Virgil." Howell sent several other messages indicating that he intended to engage in a physical confrontation with Virgil.

The physical evidence also contradicts Howell's version of the events. The damage caused to Virgil's truck and the trajectory analyses support Virgil's and Jonathan's testimony that Howell fired the first shots. The spread of the shotgun blasts indicates that Virgil's truck was shot at from a fairly close range on the driver's side and the front windshield of the truck, and there was no blast damage to the back of Virgil's truck. In addition, the glass in the back seat of the truck and truck bed indicated that the back window had been shot at from the inside out, which was consistent with Jonathan's testimony that he shot through the back window of the truck as they were spinning around and attempting to exit the premises. As such, there was sufficient evidence for the jury to reject Howell's claim of self-defense and to find him guilty of all charges.

SUPPLEMENT TO JURY INSTRUCTION NO. 14

Jury Instruction No. 14 was titled "Self-Defense." It stated:

Mr. Howell acted in defense of himself if

1. Mr. Howell reasonably believed that Jonathan . . . or . . . [Virgil] . . . threatened or attempted to kill or cause serious bodily injury to him;

2. Mr. Howell did not provoke Jonathan . . . or . . . [Virgil] . . . to threat [sic] or attempt to kill him or cause serious bodily injury to him with intent of using deadly force against Jonathan . . . or . . . [Virgil];

3. Under the circumstances as they existed at that time, Mr. Howell reasonably believed that his use of deadly force was immediately necessary to protect himself against death or serious bodily injury; and

4. Before using deadly force against either Jonathan . . . or [Virgil] . . ., Mr. Howell either tried to get away from Jonathan . . . or . . . [Virgil] . . . or did not try because he reasoned he could not do [sic] in complete safety.

The fact that Mr. Howell may have been wrong in estimating the danger to himself does not matter so long as there is a reasonable basis for what Mr. Howell believed that he acted reasonably in response to that belief.

Howell did not object to Jury Instruction No. 14. Paragraph 2 of the instruction only allows for the claim of self-defense so long as Howell did not provoke Jonathan or Virgil to threaten or attempt to kill him with the intent of using deadly force against them. This language is consistent with § 28-1409(4)(a), which states that deadly force is not justifiable if "[t]he actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter[.]" Notably, Jury Instruction No. 14 failed to specify that the provocation had to be "in the same encounter." After the jury started deliberations, Juror Question #2 was submitted to the district court. It asked, "Does provoking or inviting a person onto your property, nullify your right to use self defense if you see them draw a gun on you?" After conferring with the parties, the court responded, "Please refer to Instruction No. 14 [']Self-Defense[.'] You should apply the facts you heard as evidence to the law as set forth in the instructions."

- 21 -

Approximately 30 minutes later, three additional jury questions were presented to the parties related to how long they would have to deliberate before "it is called a hung jury?"; whether the jury would have to stay if they did not reach a verdict by 5 p.m.; and if the jury went past 5 p.m., whether they could make arrangements for picking up children. The parties agreed on the district court's proposed responses. The responses were submitted to the jury at 4:10 p.m. At 4:29 p.m., a question was asked about making a phone call to arrange for a child to be picked up. The court discussed with the parties that it was going to allow the jurors to use their phones for the next 10 minutes. At 4:35 p.m., the court convened the parties in chambers. There was no jury question pending, but the court referred back to Juror Question No. 2 regarding self-defense. The court informed the parties that it had "considered a supplemental response." It pointed out that there was a typographical error (word "threat" should have been "threaten") in the given instruction. There was no objection to this correction. The court then noted that "there is case law regarding the issue of provocation." It cited to *State v. Butler*, 10 Neb. App. 537, 634 N.W.2d 46 (2001), for the proposition that "Nebraska denies the defense of self-defense if the defendant provokes the victim with the intent to purposely cause death or serious bodily harm to the victim in the same encounter." This is a correct statement of the law, and it correctly requires the jury to find that provocation, if any, had to be "in the same encounter," as set forth in § 28-1409(4)(a). Howell objected, arguing only that the jury instructions had already been provided and deliberations had already commenced. He did not object to the substance of the proposed supplemental instruction. The court overruled the objection because "it is case law that applies to this specific question of provocation that is raised in [the jury's] second question to the Court."

Howell contends that the district court erred in giving this supplemental response to the jury. He points out that this "further instruction was done without a question from the jury." Brief for appellant at 32. He argues that the court erred in giving the supplemental response because the jury instructions had already been provided and the "jury had not requested another instructional question from the court as to Instruction No. 14." Brief for appellant at 33. Further, "it was a matter of 15 minutes later, after receiving several hung jury questions, that a verdict miraculously appeared." *Id*. For these reasons, he argues that the supplemental response prejudiced him.

Again, Howell does not complain about the substance of the supplemental instruction. Rather, his arguments focus on the timing.

We conclude that the district court's supplemental response to the jury's question about self-defense was permitted since it was a correct statement of the law. See § 28-1409(4)(a). Further, Neb. Rev. Stat. § 25-1116 (Reissue 2016) provides that if, during deliberations, jurors "desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court where the information upon the point of law shall be given." In this case, the jury asked a question related to self-defense and provocation. After giving an initial response, the court contemplated the matter further and elected to supplement its response. The supplemental response was an accurate statement of the law related to provocation. Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by a trial court. *State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022).

Notably, Juror Question #2 asked about "provoking or inviting a person onto your property" and whether the right to use self-defense is nullified if "you see them draw a gun on

you?" This question suggests that the jury may have been considering provocation in terms of Howell's threatening statements and invitation to Virgil, all preceding the event at Howell's residence. Those earlier actions were not part of the "same encounter" as the incident in which gunfire was exchanged. It would have been improper for Howell to be denied his claim of self-defense based on perceived provocative acts that took place earlier and were not part of the "same encounter" between the parties at the residence. It was therefore appropriate and beneficial to Howell for the court to make it clear to the jury that any provocation by Howell had to be in the same encounter during which the parties exchanged gunfire in order for him to be denied his claim of self-defense.

As noted, Howell does not complain about the substance of the supplemental jury instruction; rather, his complaint is with its timing and the fact that there was no jury question pending. Even if we were to conclude that it was error for the district court to supplement the jury instructions when no question was currently pending, we would not be able to conclude that a correct statement of the law, even if untimely, was prejudicial or otherwise adversely affected Howell's substantial rights for the reasons described above. See *State v. Mann*, 302 Neb. 804, 925 N.W.2d 324 (2019) (in appeal based on claim of erroneous jury instruction, appellant has burden to show that questioned instruction was prejudicial or otherwise adversely affected substantial right of appellant).

CONCLUSION

For the foregoing reasons, we affirm Howell's convictions and sentences.

AFFIRMED.